[No. A063119. First Dist., Div. Five. Feb. 8, 1995.]

ESTHER E. RAINS, Plaintiff and Respondent, v.
S. KIMBERLY BELSHÉ, as Director, etc., Defendant and Appellant.

**COUNSEL**

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, and Stephanie Wald, Deputy Attorney General, for Defendant and Appellant.

Lilly T. Spitz as Amicus Curiae on behalf of Defendant and Appellant.

Morton P. Cohen and Kathleen Lammers for Plaintiff and Respondent.

Heller, Ehrman, White & McAuliffe, Wayne S. Braveman, Meryl Macklin, John H. Bogart, Bet Tzedek Legal Services, Michael Feuer, William Flanagan and Eric M. Carlson as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**PETERSON, P. J.**—The Legislature enacted in 1992, and amended in 1994, Health and Safety Code section 1418.8. That amended statute generally allows certain incompetent patients residing in skilled nursing facilities or intermediate care facilities to receive medical treatment, after a physician has determined a patient's incapacity to give informed consent to such treatment and an interdisciplinary review team has determined the treatment is medically appropriate. We find this statute as amended to be constitutional, and reverse the trial court's contrary ruling.

### I. FACTS AND PROCEDURAL HISTORY

This appeal presents solely legal issues concerning the facial constitutionality of Health and Safety Code section 1418.8[1] as last amended. The lower court's ruling of unconstitutionality was directed to section 1418.8 as enacted in 1992. As we explain *post*, many of petitioner's arguments in the court below as to the statute's claimed deficiencies are inapposite to our facial constitutional review, which must be based upon the provisions of the amended statute. (See *Building Industry Assn.* v. *City of Oxnard* (1985) 40 Cal.3d 1, 3 [218 Cal.Rptr. 672, 706 P.2d 285].) The lower court, of course, could not consider the amendments, which were ineffective at the time of its decision. The parties agree that our decision must be based on the amended version of the statute, and have briefed its constitutionality postargument.

The challenged statute provides, after amendment in 1994 (Stats. 1994, ch. 791, § 1; the amendments to section 1418.8, including renumbering, are italicized), as follows:

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Health and Safety Code.

"(a) If the attending physician and surgeon of a resident in a skilled nursing facility or intermediate care facility[2]( prescribes or orders a medical intervention that requires informed consent be obtained prior to administration of the medical intervention, but is unable to obtain informed consent because the physician and surgeon determines that the resident lacks capacity to make decisions concerning his or her health care and that there is no person with legal authority to make those decisions on behalf of the resident, the physician and surgeon shall inform the skilled nursing facility or intermediate care facility.

"(b) *For purposes of subdivision (a), a resident lacks capacity to make a decision regarding his or her health care if the resident is unable to understand the nature and consequences of the proposed medical intervention, including its risks and benefits, or is unable to express a preference regarding the intervention. To make the determination regarding capacity, the physician shall interview the patient, review the patient's medical records, and consult with skilled nursing or intermediate care facility staff, as appropriate, and family members and friends of the resident, if any have been identified.*

"(c) *For purposes of subdivision (a), a person with legal authority to make medical treatment decisions on behalf of a patient is a person designated under a valid Durable Power of Attorney for Health Care, a guardian, a conservator, or next of kin. To determine the existence of a person with legal authority, the physician shall interview the patient, review the medical records of the patient and consult with skilled nursing or intermediate care facility staff, as appropriate, and family members and friends of the resident, if any have been identified.*

"(d) The attending physician and the skilled nursing facility or intermediate care facility may initiate a medical intervention that requires informed consent pursuant to subdivision (e) in accordance with acceptable standards of practice.

"(e) Where a resident of a skilled nursing facility or intermediate care facility has been prescribed a medical intervention by a physician and

---

[2]The Legislature has designated both a "skilled nursing facility" and an "intermediate care facility" as a type of "health facility" for purposes of section 1250 et seq.: " 'Skilled nursing facility' means a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." (§ 1250, subd. (c).) " 'Intermediate care facility' means a health facility that provides inpatient care to ambulatory or nonambulatory patients who have recurring need for skilled nursing supervision and need supportive care, but who do not require availability of continuous skilled nursing care." (*Id.*, subd. (d).)

In this opinion, we will collectively refer to "skilled nursing facility" and "intermediate care facility" as "nursing home," and sometimes to resident patients of those skilled facilities as "nursing home patients."

surgeon that requires informed consent and the physician has determined that the resident lacks capacity to make health care decisions and there is no person with legal authority to make those decisions on behalf of the resident, the facility shall, except as provided in subdivision (*h*), conduct an interdisciplinary team review of the prescribed medical intervention prior to the administration of the medical intervention. The interdisciplinary team shall oversee the care of the resident utilizing a team approach to assessment and care planning and shall include the resident's attending physician, a registered professional nurse with responsibility for the resident, other appropriate staff in disciplines as determined by the resident's needs, *and, where practicable, a patient representative,* in accordance with applicable federal and state requirements. The review shall include all of the following:

"(1) A review of the physician's assessment of the resident's condition.

"(2) The reason for the proposed use of the medical intervention.

"(*3*) *A discussion of the desires of the patient, where known. To determine the desires of the resident, the interdisciplinary team shall interview the patient, review the patient's medical records and consult with family members or friends, if any have been identified.*

"(*4*) The type of medical intervention to be used in the resident's care, including its probable frequency and duration.

"(*5*) The probable impact on the resident's condition, with and without the use of the medical intervention.

"(*6*) Reasonable alternative medical interventions considered or utilized and reasons for their discontinuance or inappropriateness.

"(*f*) *A patient representative may include a family member or friend of the resident who is unable to take full responsibility for the health care decisions of the resident, but has agreed to serve on the interdisciplinary team, or other person authorized by state or federal law.*

"(*g*) The interdisciplinary team shall periodically evaluate the use of the prescribed medical intervention at least quarterly or upon a significant change in the resident's medical condition.

"(*h*) In case of an emergency, after obtaining a physician and surgeon's order as necessary, a skilled nursing or intermediate care facility may administer a medical intervention which requires informed consent prior to the facility convening an interdisciplinary team review.

"(*i*) Physician[s] and surgeons and skilled nursing facilities and intermediate care facilities shall not be required to obtain a court order pursuant to Section 3201 of the Probate Code prior to administering a medical intervention which requires informed consent if the requirements of this section are met.

"(*j*) Nothing in this section shall in any way affect the right of a resident of a skilled nursing facility or intermediate care facility for whom medical intervention has been prescribed, ordered, or administered pursuant to this section to seek appropriate judicial relief to review the decision to provide the medical intervention.

" (*k*) No physician or other health care provider, whose action under this section is in accordance with reasonable medical standards, is subject to administrative sanction if the physician or health care provider believes in good faith that the action is consistent with this section and the desires of the resident, or if unknown, the best interests of the resident.

"(*l*) *The determinations required to be made pursuant to subdivisions (a), (e), and (g), and the basis for those determinations shall be documented in the patient's medical record and shall be made available to the patient's representative for review.*

"(*m*) This section shall remain in effect only until January 1, *1997*, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, *1997*, deletes or extends that date."

If the requirements of section 1418.8 are met, subdivision (i) thereof removes the need to obtain a court order under the provisions of Probate Code section 3201, which reads as follows: "If a patient [who lacks a conservator of the person] requires medical treatment for an existing or continuing medical condition and the patient is unable to give an informed consent to such medical treatment, a petition may be filed under this part for an order authorizing such medical treatment and authorizing the petitioner to give consent to such treatment on behalf of the patient."

Section 1418.8, as originally enacted, became effective on January 1, 1993. A petition for a writ of mandate (No. A060010) was filed in Division One of this court, seeking to invalidate the statute on constitutional grounds and stay its enforcement. The petition and request for stay were denied in an unpublished order.

The lower court then heard the petition generating this appeal which was filed by Esther E. Rains (petitioner). The trial court's statement of decision

concluded that section 1418.8, in its *preamended* form, was unconstitutional, as violating the constitutional privacy rights and due process rights of nursing home patients who lack capacity to give informed consent to recommended medical intervention. This timely appeal followed from a resulting judgment.

## II. DISCUSSION

We conclude section 1418.8[3] is constitutional. As properly interpreted, the statute does not violate the constitutional privacy rights or due process rights of those nursing home patients who are determined by a physician to lack capacity to give informed consent to recommended medical intervention, and who do not have another person with legal authority to give that consent.

The Legislature was required to deal here with a very difficult and perplexing problem: how to provide nonemergency but necessary and appropriate medical treatment, frequently of an ongoing nature, to nursing home patients who lack capacity to consent thereto because of incompetence, and who have no surrogate or substitute decision maker[4] with legal authority to consent for them. This was a legal conundrum of long standing; and although it has been held that the consent of the patient will be implied for emergency care, the question of the proper means of securing the consent of such incompetent patient for ongoing, medically necessary care, not rising to the level of an emergency, is one which is not fully addressed or satisfactorily answered by existing case law. (See, e.g., *Preston* v. *Hubbell* (1948) 87 Cal.App.2d 53, 57-59 [196 P.2d 113]; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243-244 [104 Cal.Rptr. 505, 502 P.2d 1]; *Cruzan* v. *Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 281 [111 L.Ed.2d 224, 243-244, 110 S.Ct. 2841].) This problem required an effective legislative solution which would allow timely medical treatment of incompetent nursing home patients on an ongoing basis, without the delay of two to six months frequently necessary to secure a ruling on a petition authorizing treatment under Probate Code section 3201. It is highly significant that section 1418.8, subdivision (e) requires a patient representative[5] to be a member of the interdisciplinary team overseeing the patient's care, to consider the need for medical intervention from the patient's point of view. While there may be exigent

---

[3]This and subsequent references to section 1418.8, unless otherwise indicated, are to the statute as amended.

[4]Probate Code section 4720 authorizes an attorney in fact, so designated in a durable power of attorney for health care, to make health care decisions for the principal.

Probate Code section 2355 provides for an order allowing a conservator to give informed consent to conservatee's medical treatment.

[5]Section 1418.8, subdivision (f) defines a patient representative as "a family member or friend . . . or other person authorized by state or federal law [such as a public guardian,

circumstances in which the participation of such a representative is not practicable, due to temporary unavailability, illness, or similar causes, the Legislature clearly required the routine and ongoing participation of a patient representative in such medical care decisions to ensure that nothing is overlooked from the patient's perspective.

Petitioner argues that other and arguably better legislative solutions to the problem are possible. That is not a matter for courts to decide. As we will explain, the solution reached by the Legislature in section 1418.8 is facially constitutional.

A. *Section 1418.8 Does Not Violate the Privacy Provisions of the California Constitution*

1. *Recent Relevant Precedents*

The trial court, at the time of its ruling in 1993 on the preamendment statute, did not have the benefit of a number of recent cases, in which our Supreme Court has addressed the right of privacy granted by article I, section 1 of the California Constitution, and related issues, in analogous medical contexts.

In *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 52-57 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*), our high court found no violation of the constitutional right of privacy from a nonconsensual drug testing program, including observation of urination, the medical testing of urine, and the exchange of confidential medical information attendant upon the administration of the drug testing, for persons participating in college athletic programs. The court advanced an analytical framework for deciding questions arising under this constitutional right of privacy, and found that a violation of the constitutional right of privacy is only established where three conditions are shown: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id.* at pp. 39-40.)

Further, the high court observed: "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. . . . Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute *an egregious breach of the social norms underlying the privacy right*." (*Hill, supra,* 7 Cal.4th at p. 37, italics

---

ombudsman, attorney in fact under a durable power of attorney, private conservator, private guardian]." (Cf. § 1418.8, subd. (c).)

added.) The sharing of confidential medical information resulting from testing athletes' urine for drugs and other substances did not violate this privacy right: "The NCAA's information-gathering procedure (i.e., drug testing through urinalysis) is a method reasonably calculated to further its interests in enforcing a ban on the ingestion of specified substances in order to secure fair competition and the health and safety of athletes participating in the programs." (*Id.* at p. 54; see also *People* v. *Privitera* (1979) 23 Cal.3d 697, 709-710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178] [The right of privacy under the California Constitution did not prevent the state from outlawing the actions of physicians who prescribed drugs of unproved efficacy to patients.]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 511-512 [194 Cal.Rptr. 431, 668 P.2d 738] [The right of privacy covering a patient's relationship with a psychotherapist did not prevent the state from requiring the reporting of child abuse.].)

In *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 42-44 [32 Cal.Rptr.2d 200, 876 P.2d 999] (*Heller*), our high court also found no violation of the constitutional right of privacy where the plaintiff's treating physician shared private medical information with an insurer, after the plaintiff-patient filed a medical malpractice action, even though the plaintiff-patient did not consent to the disclosure. Applying the *Hill* analysis, the court found the patient did not have a reasonable expectation of privacy under these circumstances, because information about her medical history would inevitably have to be disclosed in her malpractice action: "We conclude that, as a matter of law, plaintiff had failed to state a cause of action for invasion of her state constitutional privacy interest. This conclusion is based on the fact that plaintiff did not adequately plead facts supporting a conclusion that any expectation of privacy as to her medical condition would be reasonable under the circumstances of this case." (*Heller, supra,* 8 Cal.4th at p. 43.)

In light of the *Hill* and *Heller* cases, decided after the trial court ruled in the case at bench, the scope of the state constitutional right of privacy has been considerably clarified. Further, other relevant case law also finds no violation of the state right of privacy in analogous medical contexts. For instance, in *Johnetta J.* v. *Municipal Court* (1990) 218 Cal.App.3d 1255, 1282-1283 [267 Cal.Rptr. 666] (*Johnetta J.*), this court (Division Five), per Justice Haning, rejected claims that a statute allowing nonconsensual testing of certain persons for the AIDS virus and other communicable diseases, which might have been passed to peace officers by means of exposure to blood or saliva, was unconstitutional under either the state Constitution's right of privacy, or the right of due process: "Petitioner also argues Proposition 96 violates the California [c]onstitutional right of privacy. She correctly notes that the California right of privacy is a fundamental right,

explicitly added by the voters to the state Constitution in 1972. [Citations.] As we have previously noted in another context, however, the California right of privacy is 'not absolute' and may be subordinated to a compelling state interest. [Citations.]"

In *Jhordan C.* v. *Mary K.* (1986) 179 Cal.App.3d 386, 396-398 [224 Cal.Rptr. 530], this court (Division Five), per Justice King, also found no violation of constitutional privacy rights from the application of a statute which provided that persons desiring to conceive a child through artificial insemination must use a licensed physician to perform the procedure in order to avoid paternity claims by the sperm donor: "Public policy in these areas is best determined by the legislative branch of government, not the judicial."

Also somewhat relevant is our previous decision in *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526, 540-541 [223 Cal.Rptr. 746] (*Keyhea*), where we declined to rule that the constitutional right of privacy required a judicial finding of incompetency before the administration of psychotropic drugs on state prisoners who were thought to be incompetent and, therefore, could not provide informed consent: "It is settled in California that every person has a right to give or withhold informed consent to a proposed medical treatment, under both the state constitutional guarantee of privacy [citation] and the common law [citation]. No California appellate court, however, has addressed the question whether there is a concomitant constitutional or common law right to a judicial determination of competency before the right to refuse treatment is infringed." We noted that the cases from other jurisdictions were in conflict (*id.* at p. 540) and declined to base our decision on constitutional grounds: "We need not decide, however, whether there is a constitutional or common law right to a judicial determination of competency [before psychotropic drugs are administered], because that right is provided by statute in California . . . ." (*id.* at p. 541). Since by statute state prisoners retained the rights accorded to nonprisoners in this area, and since nonprisoners had a statutory right to refuse treatment with psychotropic drugs, we refused to conclude there was any overarching constitutional right to a judicial decision as to competency in implementing the otherwise applicable right to refuse the treatment then in issue: "Thus, regardless of constitutional and common law ramifications, nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to [refuse treatment]." (*Ibid.*)

Similarly, Division Two of this district, in *Riese* v. *St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1320-1321 [271 Cal.Rptr. 199] (*Riese*) found that *by statute* certain California patients had a right to refuse

treatment with psychotropic drugs, while noting that this right was not accorded by federal law or constitutional criteria.

Here, of course, unlike the statutory schemes addressed by *Keyhea* and *Riese*, we address a very different statutory setting, in which the Legislature has decided by a newly enacted statute, section 1418.8, to implement the right of privacy and other constitutional rights of certain patients, by providing a particular procedure by which persons in nursing homes who are determined by a physician to lack capacity to make decisions regarding their health care may receive medical treatment, even though they do not have a next of kin, an appointed conservator, or another authorized decision maker to act as their surrogate in making such health care decisions.

We, therefore, must address the constitutional issue we declined to decide in *Keyhea*, considering case law directed to the privacy area since that decision. In so doing, we note there is still no California authority precisely on point, although the issues involved are substantially clarified by the recent decisions of our Supreme Court in *Hill* and *Heller*.

We note also that the federal Supreme Court has upheld against constitutional challenge a state law procedure for administration of medications to prisoners with mental problems, which is in some ways analogous to section 1418.8 in that such decision is made pursuant to the medical judgment of physicians, without a judicial decision maker. (*Washington* v. *Harper* (1990) 494 U.S. 210, 231-232 [108 L.Ed.2d 178, 204-205, 110 S.Ct. 1028] (*Washington*).) Although not wholly determinative, this federal decision also is of help in deciding the privacy and due process issues this case raises.

In assessing the constitutionality of section 1418.8, we are also constrained by the traditionally limited scope of our review of legislative enactments for unconstitutionality. ■ It need hardly be repeated here (although this principle was not mentioned by the trial court in its otherwise exhaustive statement of decision) that a statute is presumed to be constitutional, and the burden is on those asserting its unconstitutionality to demonstrate otherwise; further, the statute will be construed, if possible, in a way which will avoid constitutional infirmities. As Justice Haning has observed: "In determining a statute's constitutionality, we start from the premise that it is valid, we resolve all doubts in favor of its constitutionality, and we uphold it unless it is in clear and unquestionable conflict with the state or federal Constitutions." (*Mounts* v. *Uyeda* (1991) 227 Cal.App.3d 111, 122 [277 Cal.Rptr. 730]; accord, *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193]; *County of Sonoma* v. *State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368 [220 Cal.Rptr. 114, 708 P.2d 693] (*County of Sonoma*).)

Since this particular case rests in large part on a claim of unconstitutionality based upon the right of privacy under the California Constitution, we are guided by the observations of Division Three of this district, approved by our Supreme Court in *Hill, supra,* 7 Cal.4th at pages 37, 55, footnote 20:

■ "The general concept of privacy can be viewed as encompassing a broad range of personal action and belief. However, that right, much as any other constitutional right, is not absolute. A court must engage in a balancing of interests rather than a deduction from principle to determine its boundaries. Although the Supreme Court stated in *White* v. *Davis* [(1975)] 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], that a compelling interest was necessary to justify any incursion into individual privacy, subsequent cases have made it clear that not every act which has some impact on personal privacy invokes the protections of the state's Constitution and requires such justification. Stated another way, a court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy." (*Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1046 [264 Cal.Rptr. 194].)

Aided by these applicable precedents, we will conclude that section 1418.8 does not violate either the right of privacy or the due process rights of affected patients.

### 2. *Privacy Rights*

■ We apply the analytical framework stated in *Hill, supra,* 7 Cal.4th at pages 39-40, to the claim that section 1418.8 is unconstitutional under the California Constitution's right of privacy. The *Hill* analysis requires us to assess section 1418.8 in terms of whether it will have an unconstitutional result because the following circumstances are present: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct . . . constituting a serious invasion of privacy." (*Hill, supra,* 7 Cal.4th at pp. 39-40.)

### a. *Legally Protected Privacy Interest*

As to the first of the three prongs of the *Hill* test, we conclude patients in nursing homes, like all other persons, certainly have a legally protected privacy interest in their own personal bodily autonomy and medical treatment, under the rubric of " 'autonomy privacy.' " (See 7 Cal.4th at p. 35.)

■ "Autonomy privacy is also a concern of the Privacy Initiative [which added privacy as an enumerated right under article I, section 1 of the California Constitution]. The ballot arguments refer to the federal constitutional tradition of safeguarding certain intimate and personal decisions from

government interference in the form of penal and regulatory laws. [Citation.] But they do not purport to create any unbridled right of personal freedom of action that may be vindicated in lawsuits against either government agencies or private persons or entities. [¶] Whether established social norms . . . protect a specific personal decision from public or private intervention is to be determined from the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative." (*Id.* at p. 36.)

■ We must stress in this context that we deal here with the privacy rights of persons who are initially determined by their physicians to be incompetent to make medical decisions or provide effective informed consent, and who are in need of medical intervention, according to the medical judgment of their treating physicians, yet have no surrogate who can provide a proxy for consent. Nothing said herein affects the rights of other persons who are competent to provide or withhold their consent, or who seek judicial intervention to uphold those rights. (Cf., e.g., *Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 749 [21 Cal.Rptr.2d 357, 855 P.2d 375] [A *competent* prisoner in a state medical facility had the right to refuse medication or nutrition through a feeding tube.]; see also *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220] ["The right of a *competent* adult patient to refuse medical treatment has its origins in the constitutional right of privacy." (Italics added.)].)

Nor do any of the "usual sources of positive law" identified in *Hill, supra,* 7 Cal.4th at page 36, impose an absolute and inflexible right to refuse treatment for persons determined *not* to be competent, for obvious reasons; such a rule would lead to unacceptable neglect of the medical needs of incompetent persons. Neither the development of the common law, nor the statutory enactment in issue here, nor the ballot arguments in support of the adoption of the privacy right, purport to prevent medical professionals from administering necessary treatment in these circumstances. Thus, while the patients in issue here have a legally protected privacy interest, this interest is considerably attenuated by the fact they are determined by their physicians to be in need of medical care, yet incompetent to provide the necessary consent for that care. Under these circumstances, patients may also have an important interest in securing treatment, even though unable to provide consent, so as to avoid constant pain, injury, malnutrition, or physical decline. In sum, while there is certainly a legally protected privacy interest here, it is not an "unbridled right" which may be applied in isolation, regardless of the specific circumstances and pressing medical needs of these patients. (See *ibid.*)

### b. *Reasonable Expectation of Privacy*

Next, under the *Hill* analysis we must determine whether section 1418.8 would unconstitutionally interfere with the "reasonable expectation of privacy" of these particular nursing home patients. (See *Hill, supra,* 7 Cal.4th at pp. 36-37.) ■ "Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy." (*Id.* at p. 36.) "In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. [Citations.]" (*Id.* at pp. 36-37.) "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. (See, e.g., Rest.2d Torts [(1977)] § 652D, com. c [pp. 387-388] ['The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.'].)" (*Id.* at p. 37.)

In *Heller, supra,* 8 Cal.4th at pages 43-44, our Supreme Court expanded on this point in the context of an alleged privacy violation resulting from the nonconsensual disclosure of the plaintiff's medical condition and other private information, after she brought a medical malpractice action. The high court found the plaintiff could not have had a reasonable expectation of privacy sufficient to establish a privacy violation, because the circumstances were such that her medical history would inevitably have been exposed during the litigation: "By placing her physical condition in issue in the . . . litigation, plaintiff's expectation of privacy regarding that condition was substantially lowered by the very nature of the action." (*Id.* at p. 43.) "Because the information would most likely have been discovered during the ordinary course of litigation, defendants' conduct in revealing information about plaintiff's treatment and physical condition does not violate the state constitutional guarantee against invasion of privacy as a matter of law." (*Id.* at p. 44.)

■ Here, as in *Heller,* the patient's reasonable expectation of privacy over private medical facts is considerably lessened by the circumstances in which this case arises. It is questionable if a person in need of medical care who is incompetent may ever have a *reasonable* expectation of privacy which would prevent timely medical intervention and treatment. Certainly it is inevitable that such persons residing in nursing homes, who are required to be under the care of a treating physician as a condition of admission (Cal. Code Regs., tit. 22, § 72303, subd. (a)), whose conditions of care and treatment are already extensively regulated by state and federal statutes and regulations, and who are not competent to consent to care will be subject to

the decisions of outside professionals (see, e.g., Prob. Code, § 3201). The patient's expectation of privacy is, accordingly, greatly lessened. Indeed, since the providing of necessary medical care to patients residing in nursing homes is the obvious and legitimate purpose of this care in general, it would be surprising to find that a statute passed by the Legislature in furtherance of this purpose was unconstitutional as a privacy violation. (Cf. *Hill, supra,* 7 Cal.4th at pp. 41-42 [The high court upheld an involuntary program of drug testing for athletes, in light of the reduced expectation of privacy applicable to a collective enterprise in which participants often observed each other in a state of undress, and medical condition information was disseminated among physicians, trainers, and other persons having a legitimate interest: "As a result of its unique set of demands, athletic participation carries with it social norms that effectively diminish the athlete's reasonable expectation of personal privacy in his or her bodily condition, both internal and external."].)

The social norms affecting persons residing in nursing homes are primarily concerned with providing sustenance, shelter, and necessary medical care in a residential setting. While persons residing in nursing homes obviously have a reasonable expectation of privacy relating to aspects of their lives which are not connected to the medical purposes of the facility, it can hardly be doubted that the reasonable expectation of privacy as it relates to medical care must be diminished. Just as persons in need of medical care must sometimes disrobe for an examination, or expose their bodies to observation by medical personnel during needed surgery, certain particular social norms apply to the provision of medical care to patients of nursing homes who are incompetent, in the professional opinion of their physicians. Our currently prevailing social norms obviously find acceptable, in the context of needed medical treatment, much which would otherwise be clearly unacceptable. Here the Legislature, as a reflection of those social norms, enacted section 1418.8 in order to ensure provision of prompt ongoing medical care to incompetent persons in need of that care. This clearly accords with the reasonable expectation of patients: that if they became incompetent they will continue to receive their necessary medical care on a timely basis. The particular nature of this setting, in which nursing homes must continue to provide necessary care to incompetent resident patients on an ongoing and timely basis, indicates section 1418.8 would not unconstitutionally violate reasonable expectations of privacy. (See *Hill, supra,* 7 Cal.4th at pp. 42-43; *Heller, supra,* 8 Cal.4th at pp. 43-44.)

c. *Seriousness of the Invasion of Privacy*

The third factor specified by the *Hill* court was the seriousness of the invasion of privacy rights which would result from the challenged conduct.

Once again, consideration of this factor does not support a finding of violation of the constitutional privacy right.

Considered in the abstract, a serious invasion of privacy would seem to result from the provision of medical treatment on a nonconsensual basis. However, as in *Heller, supra,* 8 Cal.4th at page 44, the focus cannot be placed in isolation on the fact that medical care is in issue; medical care inevitably implicates the autonomy of the body and concomitant privacy questions. Indeed, as in *Hill, supra,* we cannot focus solely on the fact that medical information or personal autonomy is at issue, without also relating this fact to the circumstances in which the case arises in order to decide the seriousness of the privacy invasion in question. Rather, in deciding the question of the seriousness of the invasion on the authority of *Hill,* we must also focus on the fact that we deal here with persons who, based upon expert medical judgment, are incompetent to provide or withhold consent, and in need of medical care which would ordinarily require such consent. It is inevitable that the medical condition and private medical facts of such patients will be in issue, whether the decision to treat or not to treat these persons is made by a conservator of the person, by a court under Probate Code section 3201, or by a medical interdisciplinary team under section 1418.8. It is very hard to see how the invasion of privacy is more serious when the issue is decided by a medical team, as opposed to a conservator, the holder (frequently a layman) of a patient's durable power of attorney, or a court relying on expert medical reports or testimony, since a decision by some outside person, even if only by default, will "inevitably" be made under the circumstances. (See *Heller, supra,* 8 Cal.4th at p. 44.)

In sum, consideration of the three factors specified by the analysis in *Hill, supra,* does not support the claim that the right of privacy attaches here so as to invalidate section 1418.8. Moreover, consideration of the defenses to a privacy violation, such as balancing of the interests at stake, is also relevant under the *Hill* analysis.

### d. *Balancing of Interests*

"The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law." (*Hill, supra,* 7 Cal.4th at p. 37.)

"Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial

activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." (*Hill, supra,* 7 Cal.4th at p. 38.)

Although these statements of our Supreme Court, regarding the "proximity" of a legitimate competing interest to an institution's central functions, may be arguably "rather unclear" (cf. *Coit Drapery Cleaners, Inc.* v. *Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1608 [18 Cal.Rptr.2d 692]), one can hardly deny that the providing of necessary medical care to patients on a timely basis is in very close "proximity" to the central functions of a nursing home and is, in fact, a compelling state interest, i.e., an obviously legitimate and socially beneficial competing interest which must be weighed in the balance.

Moreover, as *Hill* allows, the alternatives to the conduct in issue must also be considered in the balance as well: "Confronted with a defense based on countervailing interests, the plaintiff may undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives to the defendant's conduct that would minimize the intrusion on privacy interests. [Citations.]" (7 Cal.4th at p. 38.)

In this context, the petitioner and amicus curiae present a variety of alternatives to section 1418.8 which might, in their judgment, provide a better solution to the problem and more protection to nursing home patients. They primarily suggest the Legislature should have enacted an earlier, alternative version of section 1418.8, which gave more power to the system of local public guardians in each county, or other public agencies, to oversee and provide substituted consent for necessary medical procedures to be performed on incompetent nursing home patients; petitioner implicitly assails the Legislature for its failure to fund the relevant bureaucracy to effect this solution. Alternatively, it is suggested that the procedure specified by Probate Code section 3201, which allows a judge to make a medical treatment decision (after the resulting delay of uncertain and varying length to secure a hearing and decision), could exclusively continue to govern these cases.

While we agree that the interposition of another layer of bureaucracy between medical professionals and their patients might have some potential value insofar as it would *discourage* unnecessary medical treatment, it is far from clear that this would result in better and more timely medical care to nursing home patients as a whole, especially those who suffer more from

neglect than from overattention by the medical community. Further, it is not clear that this alternative would be any more sensitive to privacy rights; it would seem to involve a greater number of persons in the decisionmaking process, without necessarily improving it from a privacy standpoint, and without necessarily resulting in a greater likelihood of appropriate treatment. Certainly we cannot say the particular solution sought by petitioner was constitutionally compelled. As the federal Supreme Court has held, in rejecting a similar constitutional challenge to the treating of mentally ill inmates without a court order: "Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. . . . We cannot make the facile assumption that the patient's intentions, or a substituted judgment approximating those intentions, can be determined in a single judicial hearing apart from the realities of frequent and ongoing clinical observation by medical professionals." (*Washington, supra*, 494 U.S. at pp. 231-232 [108 L.Ed.2d at p. 204].)

More fundamentally, the right of privacy does not require the Legislature to enact any particular version of proposed legislation; instead, the Legislature must, as an initial matter, engage in a balancing process in which privacy rights are weighed against other constitutional and public rights. In our own balancing process under *Hill*, we must also accord the Legislature the initial deference which is due to its judgment as to a solution, since we must approach the subject in light of the relevant legislative pronouncements as well as the common law and societal norms. (See 7 Cal.4th at p. 38.) This does not mean, of course, that the courts abdicate their function when assessing the merits of a constitutional privacy challenge to legislation; rather, we approach the issue in light of the traditional jurisprudential limits placed upon our judicial review of legislation. (See *County of Sonoma, supra*, 40 Cal.3d at p. 368.)

When properly considered under this standard, section 1418.8 does not violate the constitutional right of privacy. The operation of the statute does not constitute an "egregious breach of the social norms underlying the privacy right." (*Hill, supra*, 7 Cal.4th at p. 37.) While the nursing home patients in issue certainly have privacy interests which are affected by section 1418.8, consideration of the diminished extent of the reasonable expectation of privacy and the seriousness of the privacy right invasion, in light of the particular circumstances faced by incompetent patients in nursing homes, does not support invalidation of section 1418.8. Finally, consideration of the balancing of interests and alternatives supports the constitutionality of the statute. (See *Hill, supra*, 7 Cal.4th at pp. 56-57.)

## B. *Section 1418.8 Does Not Violate the Due Process Provisions of the California Constitution or the Federal Constitution*

■ Petitioner next contends that section 1418.8 denies due process of law to patients of nursing homes who lack capacity to make decisions regarding their health care where there is no person with legal authority to make such decisions for them.

Petitioner's rationale is based on two interrelated contentions that the procedures established by the Legislature in such circumstances deny procedural due process to the resident patients of such nursing homes. They are:

First, that section 1418.8 permits an initial *nonjudicial* determination of the patient's incompetence by a physician or surgeon, preceding the subsequent medical intervention decision.

Second, that section 1418.8 unconstitutionally authorizes medical intervention in the case of such a patient without notice, hearing before an independent decision maker, testimony, cross-examination, a written statement by the fact finder, and a surrogate for the patient "whose only allegiances are to the desires or best interests of the patient, rather than to the provider."

In addressing these contentions, we first review the background to, and the legislative purpose in, enacting the original version of section 1418.8 (Stats. 1992, ch. 1303); then we review the current amended version of section 1418.8.

■ The Legislature in originally enacting section 1418.8 was fashioning a solution to a continuing and significant dilemma: How can necessary health care decisions be made for resident patients in nursing homes who lack capacity to make such decisions and have no surrogate to make such decisions on their behalf?

The legislative findings supporting this statutory enactment were these: "(a) When a skilled nursing facility or intermediate care facility resident loses capacity to make health care decisions, there is a need to identify a surrogate decisionmaker to make health care treatment decisions on his or her behalf. However, in many cases, the skilled nursing facility or intermediate care facility resident may have no family member who is available and willing to make health care decisions, no conservator of the person, and no other health care agent, such as an agent appointed pursuant to a valid Durable Power of Attorney for Health Care. In California, this has been

identified by health care providers and others as a significant dilemma. [¶] (b) The current system is not adequate to deal with the legal, ethical, and practical issues that are involved in making health care decisions for incapacitated skilled nursing facility or intermediate care facility residents who lack surrogate decisionmakers. Existing Probate Code procedures, including public conservatorship, are inconsistently interpreted and applied, cumbersome, and sometimes unavailable for use in situations in which day-to-day medical treatment decisions must be made on an on-going basis. [¶] (c) Therefore, it is the intent of the Legislature to identify a procedure to secure, to the greatest extent possible, health care decisionmakers for skilled nursing facility or intermediate care facility residents who lack the capacity to make these decisions and who also lack a surrogate health care decisionmaker. It is also the intent of the Legislature to ensure that the medical needs of nursing facility residents are met even in the absence of a surrogate health care decisionmaker and to ensure that health care providers are not subject to inappropriate civil, criminal, or administrative liability when delivering appropriate medical care to these residents." (Stats. 1992, ch. 1303, 1st § 1.)

The record below confirms these legislative findings: by evidence, inter alia, that financial constraints had led many public guardians to reject nursing home patients where surrogate decisionmaking was the only need; and in any event, the time lapse accompanying their actual appointment would have rendered them ineffective for nursing home patients with daily or multiple health problems. Overall, that record further confirmed that the number of medical conditions of such patients is frequently in constant fluctuation, requiring prompt medical intervention without the delay engendered by application of the Probate Code sections the Legislature deemed inadequate.

### 1. *Determination of Incompetency by Physician*

The amended statute sets forth a clear test for determination by the physician of a resident patient's capacity to make decisions concerning health care: A patient lacks that capacity if "unable to understand the nature and consequences of the proposed medical intervention, including its risks and benefits, or . . . unable to express a preference regarding the intervention." (§ 1418.8, subd. (b).) In making this capacity determination, the resident patient's physician must: (1) interview the patient, (2) review the patient's medical records, (3) consult with nursing home staff as appropriate, (4) consult with family members and friends of the patient if such have been identified. (*Ibid.*)

The addition of subdivisions (b) and (c) to section 1418.8, *ante,* has resolved petitioner's initial contentions that the preamended version of that

statute gave the physician unfettered discretion to determine capacity without a standard to follow; that a physician can deem a patient incompetent without seeing the patient or investigating the patient's medical history or looking into the patient's records. Subdivision (c) resolves the arguments urged below that "no standard" or "definition or description of a person with legal authority" to act as surrogate for such a patient is defined. They now are. The physician is required in making a capacity determination to consult the patient's records; and on admission to the facility, all nursing homes must inform patients of their right to appoint a surrogate, and are required to adopt procedures identifying both a patient's wishes for medical treatment and a surrogate decision maker. Subdivision (c) also disposes of the argument that the capacity-determining physician is not required to investigate or talk to anyone or examine the patient's records. Such requirements are statutorily extant.

Despite the statutory additions, however, petitioner and amicus curiae continue to urge that procedural due process requires the patient capacity determination to be made after " 'hearing before [and presumably decision by] an independent decision-maker.' "

Petitioner's major rationale for this position appears to be that a fair hearing on this issue cannot be obtained because the patient's examining physician, to whose judgment the Legislature has entrusted this decision under the statute's guidelines, may be someone possibly interested in finding the patient incompetent. Plainly put, petitioner suggests the patient's own physician cannot be considered a neutral arbitrator on the capacity issue because of the possibility the physician may be financially interested in undertaking income-producing medical procedures on a patient powerless to resist because of the physician's incapacity determination.

In the face of an analogous contention regarding prescription of drugs for the involuntary treatment of prison inmates, the United States Supreme Court said: "[W]e will not assume that physicians will prescribe these drugs [psychotropic medications] for reasons unrelated to the medical needs of the patients; indeed the ethics of the medical profession are to the contrary." (*Washington, supra,* 494 U.S. at p. 222, fn. 8 [108 L.Ed.2d at p. 198].) "Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." (*Id.* at p. 231 [108 L.Ed.2d at p. 204].)

These decisions are medical decisions. "[W]e agree with those [courts] which have held that requiring judicial intervention in all cases [of alleged

failure of medical providers to continue treatment of a terminally ill patient] is unnecessary and may be unwise. [Citations.]" (*Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006, 1022 [195 Cal.Rptr. 484, 47 A.L.R.4th 1].)

"We consider that a practice of applying to a court to confirm such decisions [to give or withhold medical treatment to a comatose patient] would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be *impossibly cumbersome. . . .*" (*Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 669, 79 A.L.R.3d 205], italics added; cf. *Youngberg* v. *Romeo* (1982) 457 U.S. 307, 322-323 [73 L.Ed.2d 28, 41-42, 102 S.Ct. 2452] [There is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.]; *Parham* v. *J. R.* (1979) 442 U.S. 584, 609 [61 L.Ed.2d 101, 123, 99 S.Ct. 2493] (*Parham*) [The question of whether a child is mentally or emotionally ill and can benefit from treatment is "essentially medical in character."].)

It is common knowledge that the determinate evidentiary factor in court hearings, both civil and criminal, by which the mental capacity of human beings is decided, is the expressed expert views of the medical profession. Petitioner simply argues that a hypothetical possibility exists, which this record does not support, that a physician may misrepresent the mental capacity of a nursing home patient to consent to medical intervention in order to impose that treatment for the financial gain of the physician or an associated institution.

Petitioner then urges that due process, allegedly lacking under her hypothetical proposition, requires that adversarial hearings must always be held after a physician concludes, following the protocol the Legislature has painfully and carefully constructed, that a patient with no surrogate lacks capacity to consent to medical intervention.

Capacity determination, which must be decided under section 1418.8 *before* required medical intervention is activated thereunder on potentially thousands of elderly nursing home patients in this state, would thereby be delayed, as would such treatment. No case cited to us, or disclosed by our independent research, has suggested that procedural due process requires postponement of medical intervention for a nursing home patient who is found by a physician to lack capacity to consent thereto until, in each case, the medical capacity issue is separately decided in some adversarial hearing.

To so rule would not only be cumbersome to thousands of these patients and to the courts, it would presume the bias if not dishonesty of physicians

opining as to the patient's capacity. We emphatically decline to adopt that presumption. Prompt and effective medical treatment of these unfortunate citizens would be seriously jeopardized.

We believe our elected Legislature is, more than any other single institution, better able to reflect a proper balance of social values at stake in this significant and difficult problem, and that it has done so in enacting section 1418.8. (Cf. *Matter of Conroy* (1985) 98 N.J. 321 [486 A.2d 1209, 1220, 48 A.L.R.4th 1] ["Perhaps it would be best if the Legislature formulated clear standards for resolving requests to terminate life-sustaining treatment for incompetent patients. As an elected body, the Legislature is better able than any other single institution to reflect the social values at stake."].) We reject adoption of petitioner's suggestion on the rationale proposed. To do otherwise would negate the Legislature's reforming work on a speculative basis, one absolutely contrary to the ethical standards of the medical profession. Nursing home patients are not denied due process because their incapacity to give consent to medical intervention is initially determined by a physician and surgeon, rather than by a judicial or quasi-judicial hearing.

This is particularly true here in view of the provisions of section 1418.8, subdivision (j), *ante*. As we observe in part II.B.2. and footnote 7, *post*, of this opinion, due process is assured because there is also the right to secure judicial review of a physician's determination of the patient's *incapacity* to give informed consent to that medical intervention, which is the predicate condition for the application of section 1418.8.

## 2. *Patient Representative*

Petitioner also theorizes that section 1418.8 is unconstitutional because, although the statute requires that a patient representative serve on the interdisciplinary review team which provides the surrogate consent for any medical procedure, there may be some person in a nursing home who lacks any patient representative to serve on the interdisciplinary review team. However, the statutory definition of a patient representative in section 1418.8 is so broad that it is hard to see how this could be true. Even if a patient lacks a spouse and has no surviving next of kin, and even if there is no conservator or person holding a power of attorney, and no public agency such as the ombudsman or public guardian willing to serve in this capacity, the statute still allows any "friend" of the patient to serve in this capacity and represent the patient's interests. This would include patient advocates, legal counsel, and all other persons having an interest in the welfare of the patient. It appears almost impossible to conceive of a patient who could not have a patient representative, under this standard. Certainly petitioner has not presented any convincing proof to the contrary. Moreover, as our Supreme

Court observed in *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 674 [114 Cal.Rptr. 345, 522 P.2d 1345], " 'We cannot, and need not in this proceeding, pass upon all hypothetical situations and tenuous circumstances which may be presented by counsel.[6] While we recognize that a valid statute may be unconstitutionally applied, the precise limitations to be placed on the words in question can best be specified when actual cases requiring such interpretation are presented. [Citation.]' " (Quoting from *Stein* v. *Howlett* (1972) 52 Ill.2d 570 [289 N.E.2d 409, 415].)

Thus, while we recognize that there may hypothetically be rare instances in which the participation of a patient representative may not be "practicable" under section 1418.8, subdivision (e) because, for instance, a particular conservator of the person or next of kin is out of the country or unavailable, we need not hold the entire statute unconstitutional merely because in rare cases of exigency the designated patient representative is unable to serve. We leave consideration of such hypothetical instances, and the uncertainties they may raise, to the future development of the case law; they do not support a facial challenge to the statute. "In any event, [petitioner] provides no authority to support [her] claim that the remaining uncertainties which may inhere in the statute provide a proper basis for striking it down on its face. As with other innovative procedures and doctrines—for example, comparative negligence—in the first instance trial courts will deal with novel problems that arise in time-honored case-by-case fashion, and appellate courts will remain available to aid in the familiar common law task of filling in the gaps in the statutory scheme." (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 378 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].) "It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." (*Barrows* v. *Jackson* (1953) 346 U.S. 249, 256 [97 L.Ed. 1586, 1595, 73 S.Ct. 1031].) "The delicate power of pronouncing an Act of Congress [or the Legislature] unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." (*United States* v. *Raines* (1960) 362 U.S. 17, 22 [4 L.Ed.2d 524, 529, 80 S.Ct. 519].)

---

[6] In this vein, we also need not give any particular credence to those suggestions of counsel, supported by opinions and editorial articles from newspapers, that physicians will abuse their powers and subject patients to unnecessary procedures under section 1418.8. The parade of horribles conjured up by counsel bears little relation to the prevailing ethics of the medical profession and ignores the need for participation by a patient representative under the statute. Further, we need not, and will not in this case, grant judicial notice or any dispositive weight to sensational suggestions in popular news articles which are not relevant to the statute under consideration, lacking evidentiary foundation. The practice of attempting to bolster an appeal by submitting to this court, under the guise of briefing argument, quotations from such newspaper articles is one we disapprove. (See *Mangini* v. *R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063-1065 [31 Cal.Rptr.2d 358, 875 P.2d 73]; *Tanja H.* v. *Regents of University of California* (1991) 228 Cal.App.3d 434, 440, fn. 1 [278 Cal.Rptr. 918].)

Section 1418.8, thus, affords significant safeguards which, when we consider the statutory scheme in its totality, including the right to the participation and consent of a patient representative, and the right to object and secure a decision by a neutral and independent decision maker, meet the requirements of due process. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 307-309 [19 Cal.Rptr.2d 544, 851 P.2d 826]; *Vitek* v. *Jones* (1980) 445 U.S. 480, 495-496 [63 L.Ed.2d 552, 566-567, 100 S.Ct. 1254] (*Vitek*).) As such, section 1418.8 passes constitutional muster.

Since California law requires, for good reasons, that the needs of the incompetent should not be neglected, it is only logical to expect that persons having in their care in nursing homes certain incompetent persons who lack any next of kin or other substitute decision maker should be allowed a practical, workable procedure by which consent for needed treatment could be secured. Section 1418.8 is a legislative attempt to deal with this problem without invoking the procedure under Probate Code section 3201, which is plainly unworkable for the routine and ongoing medical care of the incapacitated elderly, since that procedure frequently requires months to produce a court hearing and result, and would require thousands of hearings every year in large metropolitan counties. The resulting gridlock would serve no one's interests—least of all, those of the patients whose medical care would be necessarily delayed. If thousands of persons had to suffer neglect of medical needs for months while awaiting a court decision, those circumstances would appear to be a much more likely candidate for a constitutional challenge based upon due process principles than section 1418.8. Moreover, as the federal Supreme Court observed when rejecting a similar challenge on due process grounds to a state law mandating nonconsensual treatment of the mentally ill in state institutions, there is no reason to expect that interposition of court processes between doctors and their patients will result in better care or any practical benefit; due process certainly does not require that elaborate procedures be followed which have little or no utility, nor does it prevent a state legislature from balancing the interests in question and reaching a workable solution to a particular problem. (See *Washington*, *supra*, 494 U.S. at pp. 231-232 [108 L.Ed.2d at pp. 204-205].)

Moreover, due process does not require that medical decisions be made in the first instance by lawyers and judges. As the federal Supreme Court observed in *Parham*, *supra*, 442 U.S. at pages 607-608 [61 L.Ed.2d at pages 121-122], "[D]ue process is not violated by use of informal, traditional medical investigative techniques. . . . The mode and procedure of medical diagnostic procedures is not the business of judges." As it also observed, the interposition of judicial norms would be of questionable value where the decision being made is, at bottom, simply a medical diagnosis concerning

competency and the need for treatment: "[W]e do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to /an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions . . . may well be more illusory than real." (*Id.* at p. 609 [61 L.Ed.2d p. 123].)

More critically, any due process argument fails because it does not take into account the provision of subdivision (j) of section 1418.8, which provides: "Nothing in this section shall in any way affect the right of a resident of a skilled nursing facility or intermediate care facility for whom medical intervention has been prescribed, ordered, or administered pursuant to this section to seek appropriate judicial relief to review the decision to provide the medical intervention." Thus, affected persons or their representatives, such as a friend, public guardian, or other concerned person or entity, are afforded an avenue by which they may obtain "appropriate judicial relief," including a temporary restraining order and other injunctive relief prior to treatment, thereby satisfying due process principles.[7] (See *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 258-261 [25 L.Ed.2d 287, 293-295, 90 S.Ct. 1011] [In order to satisfy due process concerns, an objecting person must be afforded an administrative hearing before welfare benefits may be cut off, pursuant to a preliminary determination by a welfare agency.]; *Vitek, supra,* 445 U.S. at pp. 495-496 [Due process requires that persons considered as a matter of medical judgment to be mentally ill must have the opportunity to object and seek relief from an independent decision maker, when the state seeks to place them in mental hospitals.]; see also *In re Hop* (1981) 29 Cal.3d 82, 92 [171 Cal.Rptr. 721, 623 P.2d 282] [A person may not be considered a " 'voluntary' " admittee to a state mental hospital if the person is incompetent and has not been admitted by a conservator or guardian.].)

Here we do not deal with involuntary commitment to a mental hospital, with all the attendant consequences of such a commitment, which would naturally trigger a need for rather extensive due process protections. Instead, we deal with a statutory procedure by which the equivalent of informed

---

[7]After the interdisciplinary committee decides for medical intervention, judicial review of that decision under section 1418.8, subdivision (j) may encompass review of the initial medical determination that the patient lacks capacity to give informed consent (*id.,* subd. (a)), since that incapacity determination is a predicate and triggering condition to the application of section 1418.8. This right to object and seek judicial review meets the requirements of due process under the state and federal Constitutions. (See *Vitek, supra,* 445 U.S. at pp. 495-496 [63 L.Ed.2d at pp. 566-567]; *Keyhea, supra,* 178 Cal.App.3d at p. 541.)

consent may be provided, by a patient representative if practicable, and in exigent circumstances by health professionals, so as to allow necessary medical treatment to be afforded to already admitted patients of nursing homes on a routine, ongoing basis. This is consistent with due process, which does not require a judicial officer to make first-line determinations regarding medical treatments. (See *Washington, supra,* 494 U.S. at pp. 231-232 [108 L.Ed.2d at pp. 204-205]; see also *In re Eric B.* (1987) 189 Cal.App.3d 996, 1001, 1008-1009 [235 Cal.Rptr. 22] [Division Four of this district found no due process violation or other constitutional infirmity in a procedure by which the medical needs of a minor child were to be routinely monitored by a physician for two years, despite the parents' religious objections to medical care.].)

The opportunity to seek a decision by a neutral decision maker as to any particular medical intervention also nullifies petitioner's objection that section 1418.8 violates due process. Even though the statute allows the patient's physician to determine *initially* whether the patient lacks the capacity to make medical decisions, and the interdisciplinary team assessing the reasons for the treatment under section 1418.8 would also often include the physician who had initially prescribed the treatment under review, this initial decision is not final. Parties seeking to object to such a decision, including the patient, the patient's representative, or a public agency which supervises or investigates the care provided by nursing homes, still retain full access to a neutral determination by a court under subdivision (j) of section 1418.8. This comports with due process principles. (See *Washington, supra,* 494 U.S. at p. 235 [108 L.Ed.2d at pp. 206-207].)

Section 1418.8 in its subdivision (f) further contemplates compliance with applicable federal and state requirements designed to protect nursing home patients, such as the standards set and regulations promulgated under 42 United States Code section 1395i-3 and 42 Code of Federal Regulations, section 483.1 et seq. (1993) which both limit and supplement the interdisciplinary team decisionmaking approach by granting certain rights and safeguards to affected residents. In addition, section 1418.8 by its own terms applies only to the relatively nonintrusive and routine, ongoing medical intervention, which may be afforded by physicians in nursing homes; it does not purport to grant blanket authority for more severe medical interventions such as medically necessary, one-time procedures which would be carried out at a hospital or other acute care facility, as to which compliance with Probate Code section 3200 et seq. would still be required, except in emergency situations. Finally, the protections of state law which apply to any particular medical intervention or procedure would continue to apply. Consideration of these numerous statutory safeguards (see *Keyhea, supra,* 178

Cal.App.3d at p. 541) undermines the claim that section 1418.8 violates due process standards.

"In light of the foregoing discussion the due process challenge is without merit." (*Johnetta J.*, *supra*, 218 Cal.App.3d at p. 1283, fn. 9.) Considering section 1418.8 in its totality, including the right to seek judicial relief and the other safeguards granted not only by section 1418.8 itself but also in the other state and federal regulatory standards referenced therein, we find the statute affords due process under both the state and federal Constitutions.

### C. *Conclusion*

The Legislature may hereafter arguably craft a different solution to the problem than section 1418.8, which would exceed constitutional minima or provide additional protections to the patients of nursing homes. The opportunity for such legislative consideration has been reserved by the sunset provision of section 1418.8, subdivision (m). However, we are not in the business of reviewing legislation to determine whether it may be improved; we may only determine whether it is constitutional. "[T]he Constitution does not prohibit the State from permitting medical personnel to make the decision [to medicate] under fair procedural mechanisms. . . . [¶] . . . 'The mode and procedure of medical diagnostic procedures is not the business of judges. . . .' " (*Washington*, *supra*, 494 U.S. at pp. 231-232 [108 L.Ed.2d at pp. 204-205].) The procedures provided by section 1418.8 do not violate the constitutional rights of nursing home patients to procedural due process or their right of privacy. (See *County of Sonoma*, *supra*, 40 Cal.3d at p. 368.)

### III. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to enter a new order denying the petition. Each party shall bear its own costs.

King, J., and Haning, J., concurred.