[No. B137002. Second Dist., Div. Two. May 18, 2000.]

DIANE L. JOHNSON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CALIFORNIA CRYOBANK, INC., et al., Real Parties in Interest.

**COUNSEL**

Farnell, Koontz & Norman, R. Richard Farnell and Walter G. Koontz, Jr., for Petitioners.

No appearance for Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Timothy R. Graves and Judith M. Tishkoff for Real Party in Interest California Cryobank, Inc.

La Follette, Johnson, De Haas, Fessler & Ames and Gillian N. Pluma for Real Party in Interest Cappy M. Rothman.

Davis Wright Tremaine, Gary L. Bostwick and Rochelle L. Wilcox for Real Party in Interest John Doe.

No appearance for Real Party in Interest Charles A. Sims.

**OPINION**

**MALLANO, J.***—

INTRODUCTION

Petitioners Diane L. Johnson and Ronald G. Johnson, along with their minor daughter Brittany L. Johnson, filed an action against real parties in interest, California Cryobank, Inc., Cappy M. Rothman, M.D., and Charles A. Sims, M.D., claiming that real parties failed to disclose that the sperm they sold came from a donor with a family history of kidney disease called Autosomal Dominant Polycystic Kidney Disease (ADPKD). That sperm was used to conceive Brittany who has been diagnosed with this serious kidney disease. When petitioners sought to take the deposition and obtain documents of John Doe, the person believed to be the anonymous sperm donor, real parties (including John Doe) filed motions to quash the deposition subpoena. At the same time, petitioners filed a motion to compel compliance with the deposition subpoena. The trial court denied petitioners'

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

motion and granted the motions to quash the deposition subpoena. By their petition, petitioners seek a writ of mandate directing the superior court to vacate its order and issue a different order compelling John Doe's deposition and the production of records.

The novel issue presented here is whether parents and their child, conceived by the sperm of an anonymous sperm donor, may compel the donor's deposition and production of documents in order to discover information relevant to their action against the sperm bank for selling sperm that they alleged transmitted ADPKD to the child. As fully discussed below, we conclude that the alleged sperm donor in this case must submit to a deposition and answer questions, as well as produce documents, which are relevant to the issues in the pending action, but that his identity should remain undisclosed to the fullest extent possible.

### FACTUAL AND PROCEDURAL HISTORY

*The Second Amended Complaint*

Petitioners sued Cryobank, as well as its employees, officers, and directors, Doctors Sims and Rothman, for professional negligence, fraud, and breach of contract. In their second amended complaint, petitioners allege as follows. Diane and Ronald Johnson decided to conceive a child through the use of a sperm donor upon the recommendation of their infertility doctors. The Johnsons contacted Cryobank's sperm bank facility in Los Angeles. Ultimately, Cryobank sold the Johnsons frozen sperm specimens donated by donor No. 276. At or near the time of sale, the Johnsons signed Cryobank's form agreement that provided, in relevant part, that "Cryobank shall destroy all information and records which they may have as to the identity of said donor, it being the intention of all parties that the identity of said donor shall be and forever remain anonymous."

At the time of their purchase, Cryobank assured the Johnsons that the anonymous sperm donor had been fully tested and genetically screened. The Johnsons' doctors then implanted the purchased sperm in one of Diane Johnson's fallopian tubes. The procedure was successful and Brittany was born on April 18, 1989. In May 1995, the Johnsons were informed that Brittany was positively diagnosed with ADPKD.

As neither Ronald nor Diane Johnson has ADPKD or a family history of the disease, it was donor No. 276 who genetically transmitted ADPKD to Brittany. At the time donor No. 276 sold his sperm to Cryobank in December 1986, Doctors Sims and Rothman at Cryobank interviewed him and

learned that the donor's mother and his mother's sister both suffered from kidney disease and hypertension, and the donor's mother suffered a 30 percent hearing loss before the age of 60. The presence of multiple instances of kidney disease coupled with hypertension and neurological disorders, such as deafness, are red flag indicators of the presence of ADPKD in donor No. 276's family, and thus, Cryobank and Doctors Sims and Rothman knew that donor No. 276's sperm could be at risk of genetically transferring kidney disease.

Even though Cryobank knew of donor No. 276's family history of kidney disease, none of this information was provided to the Johnsons at or prior to the time they purchased the sperm specimens. Despite this knowledge, Cryobank's staff falsely represented to the Johnsons that the sperm they were purchasing was tested and screened for infectious and genetically transferable diseases and safe to effectuate their pregnancy. Cryobank failed properly to test and screen donor No. 276 and conduct further investigation or testing of the donor once they learned that he had a family history of kidney disease.

*The Answer*

Cryobank answered, asserting several affirmative defenses to petitioners' action, including comparative fault. Cryobank alleges that "persons or parties not named [in] this action . . . may have contributed to a certain degree to the injuries alleged to have been sustained by plaintiffs."

*The Discovery Dispute*

During the course of the action, petitioners propounded discovery to Cryobank seeking information regarding donor No. 276, including his name, address, and medical history. Cryobank objected to providing any information regarding donor No. 276, claiming the donor's right to privacy and his physician-patient privilege. Cryobank did, however, produce two donor consent agreements that were in use at the time donor No. 276 sold his sperm. Both of these agreements state that the donor will be compensated for each sperm specimen, that he will not attempt to discover the identity of the persons to whom he is donating his sperm, and that his identity "will be kept in the strictest confidence unless a court orders disclosure for good cause . . . ." Cryobank also produced a document showing that on September 6, 1991, Cryobank informed Diane Johnson that donor No. 276 had been withdrawn from the donor program because "new information on his family members . . . indicates that he is at risk for kidney disease" and that a "few small cysts were found" after performing a "renal ultrasound." Cryobank's

responses to interrogatories indicated that donor No. 276 had sold 320 deposits of his semen to Cryobank. Donor No. 276's agreement with Cryobank indicated that he received approximately $35 per semen specimen. Donor No. 276 thus received a total of $11,200 for his sperm.

Cryobank also produced documents to petitioners at the deposition of Cryobank's genetic counselor, which included the following: (1) a December 1986 donor profile chart indicating that donor No. 276's mother and aunt have or have had high blood pressure and kidney disease and that his mother had experienced 30 percent deafness before age 60, and (2) a May 1995 letter from Cryobank's genetic counselor to Brittany's physician indicating that donor No. 276's (a) maternal aunt, age 63, is affected with ADPKD and has had a kidney transplant, (b) maternal grandmother died at age 49 of ADPKD and heart failure, (c) mother, age 57, is affected with ADPKD and "currently is in good health," and (d) sister, age 32, has been evaluated for ADPKD and is "apparently not affected." The letter indicated that donor No. 276 "is in good health" and "had a renal ultrasound examination in June 1991" and "there was no evidence of hydronephrosis of either the right or left kidney." The May 1995 letter also enclosed a "pedigree" medical history obtained from donor No. 276 in April 1991. None of the documents produced identified the donor or any member of his family.

Petitioners moved to compel further responses to their discovery requests regarding the identity and medical history of donor No. 276. They also moved to compel answers to questions asked of Cryobank's genetic counselor regarding donor No. 276's identity and medical history. Petitioners argued that they were entitled to have all of donor No. 276's medical information in Cryobank's possession and disclosure of donor No. 276's identity so that they could question him directly because the information (1) was relevant to the issues in the litigation, and (2) was necessary "as a predictor of the medical fate of Brittany" and is "one of the most reliable indicators of Brittany's future."

Petitioners submitted two declarations from Brittany's doctors in support of their motion. One of the doctors stated that Brittany has "cysts [on her kidneys] much larger than those reported in the donor and clearly has a highly penetrant form of ADPKD. . . . [S]he [will] likely progress much more rapidly than most patients with ADPKD who don't develop cysts until their 4th or 5th decade of life." He expressed the "utmost concern" in "gaining access to the Donor as well as members of his family to determine which of the two known ADPKD genes exists in the family and has been inherited by Brittany. This information is vital to my diagnosis and treatment of Brittany and to her health and well-being." A second doctor stated that

donor No. 276's "family history with ADPKD may portend the overall future course of the disease in Brittany. Obtaining as much information as possible about the Donor and his family's experience with ADPKD will provide an important diagnostic tool in understanding and prognosticating the clinical course of the disease in Brittany."

The trial court granted petitioners' motions and Cryobank filed a petition for writ of mandate with this court. We summarily denied the petition and Cryobank petitioned the Supreme Court for review. The Supreme Court granted review and transferred the matter to us with directions to vacate the order denying mandate and issue an order directing the trial court to show cause why relief should not be granted. As a result, we issued an alternative writ of mandate. The trial court responded in August 1997 by vacating its order granting petitioners' motion.

Subsequently, petitioners' counsel located real party in interest John Doe, who they believe is donor No. 276. John Doe does not admit that he is in fact donor No. 276. Petitioners served him with deposition and trial subpoenas in September 1998.

Petitioners and John Doe, through his counsel, then negotiated and signed a detailed and comprehensive stipulation in June 1999 concerning his testimony in the case. The stipulation would have maintained the confidentiality of John Doe's identity and limited his testimony at deposition and trial to (a) his involvement with Cryobank and (b) his, as well as his family's, medical history as it relates to ADPKD.

Prior to a September 1999 hearing at which petitioners asked the trial court to approve the stipulation and enter a protective order, John Doe submitted a declaration stating that he did not want his deposition taken. In addition, Cryobank objected to the stipulation and protective order and opposed any deposition of John Doe. The trial court denied petitioners' request to approve the stipulation.

Because John Doe was now unwilling to have his deposition taken, petitioners sent notice of their intent to proceed with the deposition based upon the previously served deposition subpoena. The renotice of the deposition required that John Doe appear at a deposition and produce the following categories of records: (1) records concerning John Doe's "involvement with . . . Cryobank"; (2) records concerning John Doe's family's "affliction with [ADPKD], including all known secondary health problems experienced by afflicted family members"; (3) records concerning John Doe's "medical health as it relates to symptomology of ADPKD"; (4)

records concerning "the date [John Doe] was first diagnosed as being afflicted with [ADPKD]"; (5) records concerning John Doe's communications with Cryobank "at any time after he was removed as an active donor from their panel"; and (6) records concerning John Doe which he would be entitled to inspect under California law.[1]

When he failed to appear, petitioners moved to compel that John Doe comply with the subpoena to attend his deposition and produce the requested documents. Real parties in interest, including John Doe, opposed the motion. In addition, Cryobank and John Doe moved to quash the deposition subpoena. Prior to the hearing on the parties' respective motions, the court ordered that John Doe's anonymity be preserved pending the court's ruling on the motions.

On November 2, 1999, the trial court denied petitioners' motion. The trial court ruled that John Doe had a privacy interest in remaining anonymous, which was heightened by the confidentiality agreement he signed with Cryobank, and that petitioners had not demonstrated a compelling state interest that outweighs John Doe's right to remain anonymous. The trial court further found that petitioners "have access to other relevant and ongoing medical information, which assists Brittany's health and well-being; it is unproven that John Doe would provide any new 'insight' into the medical condition during deposition." This petition followed.

## DISCUSSION

*Basis for Writ Review*

 Writ proceedings are not the favored method for reviewing discovery orders because typically the delay caused by such review results in greater harm than in the enforcement of an improper discovery order. (*Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 5 [123 Cal.Rptr. 283, 538 P.2d 739]; *Catanese v. Superior Court* (1996) 46 Cal.App.4th 1159, 1163 [54 Cal.Rptr.2d 280]; see also *West Pico Furniture Co. v. Superior Court* (1961) 56 Cal.2d 407, 415 [15 Cal.Rptr. 119, 364 P.2d 295], quoting *Ryan v. Superior Court* (1960) 186 Cal.App.2d 813, 816-817 [9 Cal.Rptr. 147] ["[o]ne of the prime purposes of the Discovery Act is to expedite the trial of the action"].) The aggrieved party must usually wait to raise the ruling by direct appeal from the final judgment. (*Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 169 [84 Cal.Rptr. 718, 465 P.2d 854].)

---

[1]Real parties in interest do not dispute in their returns to the alternative writ of mandate the validity of the request for documents included in the renotice. We therefore treat the subpoena served on John Doe as requesting both testimony and records.

As a result, writ review of discovery rulings are limited to situations where (1) the issues presented are of first impression and of general importance to the trial courts and to the profession (*Oceanside Union School Dist. v. Superior Court* (1962) 58 Cal.2d 180, 185-186, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439]), (2) the order denying discovery prevents a party from having a fair opportunity to litigate his or her case (*Waicis v. Superior Court* (1990) 226 Cal.App.3d 283, 286-287 [276 Cal.Rptr. 45]; *Lehman v. Superior Court* (1986) 179 Cal.App.3d 558, 562-563 [224 Cal.Rptr. 572]), or (3) the ruling compelling discovery would violate a privilege (*Sav-On Drugs, Inc. v. Superior Court, supra,* 15 Cal.3d at pp. 5-6; *Roberts v. Superior Court* (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309]; *Korea Data Systems Co. v. Superior Court* (1997) 51 Cal.App.4th 1513, 1516 [59 Cal.Rptr.2d 925]).

■ Here, we review whether petitioners may subject John Doe to a nonparty deposition and force him to produce documents concerning his and his family's medical history with ADPKD notwithstanding his right to privacy. Because of the novel issue presented by this case—whether parents and their child, conceived by the sperm of an anonymous donor, may compel the donor's deposition and production of documents in order to discover information relevant to their action against the sperm bank for selling sperm which allegedly transmitted a serious kidney disease—we granted an alternative writ of mandate.

*Standard of Review*

■ Management of discovery lies within the sound discretion of the trial court. Consequently, appellate review of discovery rulings is governed by the abuse of discretion standard. (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 378, 380 [15 Cal.Rptr. 90, 364 P.2d 266].) Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612 [56 Cal.Rptr.2d 341].) The trial court's determination will be set aside only when it has been demonstrated that there was " 'no legal justification' " for the order granting or denying the discovery in question. (*Ibid.,* citing *Carlson v. Superior Court* (1961) 56 Cal.2d 431, 438 [15 Cal.Rptr. 132, 364 P.2d 308].)

We are reminded, however, that in passing on orders denying discovery, appellate courts "should not use the trial court's discretion argument to defeat the liberal policies of the statute." (*Greyhound Corp. v. Superior Court, supra,* 56 Cal.2d 355, 378-379.)

## The Scope of Discovery

Code of Civil Procedure section 2017 provides the framework for discovery in civil cases. Unless otherwise limited by court order, "any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." This same section further provides that "[d]iscovery may be obtained of the identity and location of persons having knowledge of any discoverable matter, as well as of the existence, description, nature, custody, condition, and location of any document . . . ." This standard is incorporated by reference into the statute governing oral depositions (Code Civ. Proc., § 2025, subd. (a)), and is equally applicable to discovery of information from a nonparty as it is to parties in the pending suit (Code Civ. Proc., §§ 2020, subd. (a), 2025, subd. (a)).

Based upon this broad standard, unless precluded by a privilege or other right, petitioners are entitled to take John Doe's deposition and inquire whether he is donor No. 276, and if he is, delve into his health, medical history, and communications with Cryobank and obtain documents on those subjects as are relevant to the pending litigation. (See Code Civ. Proc., §§ 1987.1, 2020, subd. (h).) Such information is directly relevant to the nondisclosure and misrepresentation claims being made by petitioners against Cryobank and Doctors Sims and Rothman, the extent of petitioners' damages, and Cryobank's affirmative defense of comparative fault.

Here, real parties in interest contend that petitioners may not depose John Doe because (1) the physician-patient privilege protects all of his communications with Cryobank and its doctors, (2) the Johnsons' agreement with Cryobank precludes disclosure of the donor's identity, and (3) the constitutional right of privacy protects his identity. We examine each of these contentions.

## The Physician-Patient Privilege

Cryobank and Doctor Rothman contend that petitioners are not entitled to John Doe's deposition, even if he is donor No. 276, because all the communications between him and the physicians at Cryobank are protected by the physician-patient privilege. We disagree.

Evidence Code section 994 provides that "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician."

The patient is the holder of the privilege. (Evid. Code, § 993, subd. (a).) Here, the supposed patient, John Doe, has *not* asserted the physician-patient privilege to preclude his own deposition. But, because a physician has a duty to assert the privilege whenever he or she is present and a privileged communication is sought to be disclosed (Evid. Code, § 995), we determine whether the privilege is applicable here.

In order for a party to invoke the physician-patient privilege under Evidence Code section 994, there must be a patient. A "patient" is defined under section 991 as "a person who consults a physician or submits to an examination by a physician for the purpose of securing a diagnosis or preventative, palliative, or curative treatment of his physical or mental or emotional condition." Therefore, if a person does not consult a physician for diagnosis or treatment of a physical or mental ailment, the privilege does not exist. (*Kizer v. Sulnick* (1988) 202 Cal.App.3d 431, 439 [248 Cal.Rptr. 712] [persons were not patients when they consulted with a physician as part of a study to determine whether residents shared similar medical complaints to determine further whether the presence of a waste facility was the cause of these symptoms because purpose was not to obtain a diagnosis]; see also *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1168 [53 Cal.Rptr.2d 93] [person submitting herself to bonding study to determine whether termination of parental rights should be ordered was not a patient]; *People v. Cabral* (1993) 12 Cal.App.4th 820, 828 [15 Cal.Rptr.2d 866] [because appellant's "dominant purpose" was not to obtain treatment, but to achieve probation, privilege did not apply].) The party asserting the privilege has the burden of proof regarding the existence of the privilege. (*Kizer v. Sulnick, supra*, 202 Cal.App.3d at p. 439.)

Real parties in interest have failed to demonstrate that the physician-patient privilege is applicable in this case. The evidence presented to the trial court revealed that donor No. 276 visited Cryobank for the sole purpose of selling his sperm. That he consulted with Cryobank's physicians and medical personnel as part of the process of donating his sperm does not change the dominant purpose for his visit. There was no evidence presented to the trial court that donor No. 276 visited Cryobank "for the purpose of securing a diagnosis or preventative, palliative, or curative treatment of his physical or mental or emotional condition." Thus, we conclude that the physician-patient privilege has no application here.

*John Doe's Status as Third Party Beneficiary*

John Doe next claims that petitioners are not entitled to discover his identity because their contract with Cryobank prohibits it. John Doe argues

that petitioners' agreement with Cryobank providing that the sperm donor's identity would never be disclosed was made for his benefit and thus, as a third party beneficiary, he is entitled to keep his identity confidential as the agreement requires. While we agree that John Doe is a third party beneficiary, we disagree that the agreement precludes disclosure of his identity or related information under any circumstance.

### 1. *John Doe Is a Third Party Beneficiary*

■ "Under California law third party beneficiaries of contracts have the right to enforce the terms of the contract under Civil Code section 1559 which provides: 'A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.' " (*Harper v. Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1086 [66 Cal.Rptr.2d 64].) The promise in such a situation is treated as having been made directly to the third party. (*Outdoor Services, Inc. v. Pabagold, Inc.* (1986) 185 Cal.App.3d 676, 681 [230 Cal.Rptr. 73].) The third party need not be identified by name. It is sufficient if the third party belongs to a class of persons for whose benefit the contract was made. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1485 [77 Cal.Rptr.2d 479].) It is not necessary, however, that the contract be exclusively for the benefit of the third party; he need not be the sole or primary beneficiary. (*COAC, Inc. v. Kennedy Engineers* (1977) 67 Cal.App.3d 916, 920 [136 Cal.Rptr. 890]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 665, p. 603.)

"A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that third party and such intent appears on the terms of the contract. [Citation.] . . . [¶] . . . Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered. [Citation.]" (*Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1724-1725 [33 Cal.Rptr.2d 291].)

■ In this case, the Johnsons promised in their contract with Cryobank that they would, among other things, "not now, nor at any time, require nor expect [Cryobank] to obtain or divulge . . . the name of said donor, nor any other information concerning characteristics, qualities, or any other information whatsoever concerning said donor." The Johnsons further agreed "that, following the said insemination, [Cryobank] shall destroy all information and records which they may have as to the identity of said donor, it being the intention of all parties that the identity of said donor shall be and forever

remain anonymous." The agreement bound the Johnsons as well as their heirs and assigns.

We conclude that the Cryobank agreement with the Johnsons expresses the clear intent of both the Johnsons and Cryobank that the donor's identity and related information would be kept confidential and that such intent was for the benefit of all parties, including the donor. Our conclusion is further supported by Diane Johnson's testimony at her deposition in this case where she stated it was her intent by executing the Cryobank agreement that the donor's identity would not be disclosed to her and that her identity would not be disclosed to the donor. While John Doe or Donor No. 276 are not specifically named in the agreement, it is clear that he belongs to the class of persons—Cryobank sperm donors—who are to benefit from the agreement's confidentiality provisions.

But, our analysis does not end here. We must determine whether the Cryobank agreement with the Johnsons is contrary to an express provision of law, the policy of express law, or public policy and, hence, unenforceable. (Civ. Code, § 1667; *Metropolitan Creditors Service v. Sadri* (1993) 15 Cal.App.4th 1821, 1825-1826 [19 Cal.Rptr.2d 646] [contracts contrary to public policy are unlawful and unenforceable].) We conclude for the reasons stated below, that the Cryobank agreement goes too far in precluding disclosure of the donor's identity and related information under *all* circumstances and thus conflicts with public policy.

2. *Cryobank's Agreement Conflicts with Public Policy*

Family Code section 7613 provides: "(a) If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician and surgeon shall certify their signatures and the date of the insemination, and retain the husband's consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician and surgeon's failure to do so does not affect the father and child relationship. *All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician and surgeon or elsewhere, are subject to inspection only upon an order of the court for good cause shown.* [¶] (b) The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (Italics added.)

Civil Code former section 7005, which Family Code section 7613 continued without substantial change, was part of the Uniform Parentage Act approved in 1973 by the National Conference of Commissioners on Uniform State Laws and adopted almost verbatim by California in 1975. (*Jhordan C. v. Mary K.* (1986) 179 Cal.App.3d 386, 392 [224 Cal.Rptr. 530].) In *Jhordan C. v. Mary K.*, the First District explained that former Civil Code section 7005 affords women a vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and provides men with a statutory vehicle for donating semen to women without fear of liability for child support. (179 Cal.App.3d at p. 392.) But there are no published cases that have analyzed the wording of subdivision (a) italicized above.

■ In construing this statute, we look first to the words of the statute, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided. (*Seidler v. Municipal Court* (1993) 12 Cal.App.4th 1229, 1234 [16 Cal.Rptr.2d 90].)

■ The express terms of Family Code section 7613, subdivision (a) provide that a husband's written consent to the insemination must be retained by the physician "as part of the medical record." "All papers and records pertaining to the insemination" wherever located—which we construe as being broader than, and including, the "medical record" previously mentioned—are subject to being inspected "upon an order of the court for good cause." (*Ibid.*) Such "papers and records pertaining to the insemination" would be expected in most cases to include the name and address and related information of the sperm donor whose sperm is used in the insemination, as is apparently the case here. (See Comment, *The Potential for Products Liability Actions When Artificial Insemination by an Anonymous Donor Produces Children with Genetic Defects* (1994) 98 Dick. L.Rev. 519, 525-526 [concluding that this provision of the Uniform Parentage Act, which has been adopted in numerous states, allows disclosure of a sperm donor's identity upon a showing of good cause].) Accordingly, we conclude that based on the policy expressed in Family Code section 7613, inspection of insemination records, including a sperm donor's identity and related information contained in those records, may be disclosed under certain circumstances. Thus, to prohibit disclosure of the donor's identity and related information in every situation and under all circumstances, as Cryobank and John Doe attempt to do here by the Johnsons' agreement with Cryobank, would be contrary to the policy expressed in the statute. We note that Cryobank has apparently recognized that disclosure of a donor's identity

could be allowed under certain circumstances as its agreement with all of its donors provides that the donor's identity "will be kept in the strictest confidence unless a court orders disclosure for good cause."

And enforcement under all circumstances of a confidentiality provision such as the one in Cryobank's contract with the Johnsons conflicts with California's compelling interest in the health and welfare of children, including those conceived by artificial insemination. (See, e.g., *Mansfield v. Hyde* (1952) 112 Cal.App.2d 133, 139 [245 P.2d 577] [the state, as *parens patriae*, is charged with continuing interest in minor children's welfare and has surrounded the matter with many protective laws].) There may be instances under which a child conceived by artificial insemination may need his or her family's genetic and medical history for important medical decisions. For example, such genetic and medical history can lead to an early detection of certain diseases and an increased chance of curing them. In some situations, a person's ability to locate his or her biological relative may be important in considering lifesaving transplant procedures. (See Swanson, *Donor Anonymity in Artificial Insemination: Is It Still Necessary?* (1993) 27 Colum. J.L. & Soc. Probs. 151, 174, 183-184 (hereafter Swanson); Koehler, *Artificial Insemination: In the Child's Best Interest?* (1996) 5 Alb. L.J. Sci. & Tech. 321, 324-330; Note, *FDA Approved?: A Critique of the Artificial Insemination Industry in the United States* (1997) 30 U. Mich. J.L. Reform 823, 847-850.) While in most situations the donor's genetic and medical information may be furnished without the need of disclosing the donor's identity, there may be other situations that require disclosure of the donor's identity in order to obtain the needed information. In either event, a contract that completely forecloses the opportunity of a child conceived by artificial insemination to discover the relevant and needed medical history of his or her genetic father is inconsistent with the best interests of the child.

We conclude that Cryobank's agreement with the Johnsons precluding disclosure of the donor's identity and other information pertaining to the donor under all circumstances is contrary to public policy and therefore unenforceable. Because a third party beneficiary such as John Doe can only enforce a contract where there is a " 'valid and subsisting obligation between the promisor and the promisee' " (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, supra,* 65 Cal.App.4th at pp. 1485-1486; 1 Witkin, Summary of Cal. Law, *supra,* § 662, p. 601), we hold that the Cryobank agreement with the Johnsons does not preclude disclosure of the donor's identity and related information about the donor.

*The Constitutional Right of Privacy*

Finally, real parties in interest contend that petitioners are precluded from deposing John Doe because to do so would violate his constitutional right of privacy under the federal and California Constitutions. We

agree with real parties that donor No. 276 has a right of privacy in his medical history and his identity. We disagree, however, that such a right precludes his deposition and the production of the records requested in the deposition subpoena.

██ The California Constitution expressly provides that all people have the inalienable right to privacy. (Cal. Const., art. I, § 1; see also *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 325-326 [66 Cal.Rptr.2d 210, 940 P.2d 797] [the California Constitution expressly recognizes a right of privacy and is considered broader than the implied federal right to privacy].) "In *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 52-57 [26 Cal.Rptr.2d 834, 865 P.2d 633] . . . , our high court found no violation of the constitutional right of privacy from a nonconsensual drug testing program, including observation of urination, the medical testing of urine, and the exchange of confidential medical information attendant upon the administration of the drug testing, for persons participating in college athletic programs. The court advanced an analytical framework for deciding questions arising under this constitutional right of privacy, and found that a violation of the constitutional right of privacy is only established where three conditions are shown: '(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.' (*Id.* at pp. 39-40.)" (*Rains v. Belshé* (1995) 32 Cal.App.4th 157, 167 [38 Cal.Rptr.2d 185].)

This right to privacy was described in *Hill* as encompassing informational privacy and autonomy privacy: "Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 35.) We apply the *Hill* three-pronged analysis to determine whether, as real parties contend, donor No. 276 has a legally recognized privacy interest in his identity and medical history that precludes his deposition and production of records.

## 1. *Legally Recognized Privacy Interest*

██ A person's medical history undoubtedly falls within the recognized zones of privacy. (*Jones v. Superior Court* (1981) 119 Cal.App.3d 534, 549-550 [174 Cal.Rptr. 148]; *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55]; *Pettus v. Cole*

(1996) 49 Cal.App.4th 402, 440-441 [57 Cal.Rptr.2d 46] ["it is well settled that the zone of privacy created by [the California Constitution] extend[s] to the details of a patient's medical and psychiatric history"].) In *Gherardini*, the court held that "[a] person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature that many areas already judicially recognized and protected." (93 Cal.App.3d at p. 678.) Because donor No. 276's identity is necessarily linked with his medical history, he likewise has a privacy interest in the disclosure of his identity.

This conclusion is further compelled by the pronouncement in Family Code section 7613 that "[a]ll papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician and surgeon or elsewhere, are subject to inspection only upon an order of the court for good cause shown." Such papers and records would be expected in most situations to contain identifying information regarding the donor. By specifying that such records "are subject to inspection only upon an order of the court for good cause shown," we conclude that the statute reveals an intent to create a limited privacy interest for sperm donors.

### 2. *Reasonable Expectation of Privacy in the Circumstances*

" 'Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy.' . . . 'In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. [Citations.]' " (*Rains v. Belshé, supra*, 32 Cal.App.4th at p. 173, quoting *Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at pp. 36-37.)

The record before us reveals that Cryobank routinely told its sperm donors that nonidentifying medical history and related information could be disclosed to the purchasers of the sperm. Such warnings naturally lessen the donor's expectation that nonidentifying medical information will not be revealed to purchasers of the sperm. Indeed, some of donor No. 276's nonidentifying medical history has already been disclosed to petitioners. We thus conclude that donor No. 276's reasonable expectation as to the disclosure of nonidentifying medical information was substantially diminished.

And donor No. 276's reasonable expectation of privacy in his identity was substantially diminished by his own conduct. This is not a case of a donor making isolated donations of his sperm in order to help one woman conceive a child. Rather, the record before us reveals that donor No. 276 deposited over 320 specimens of his semen with Cryobank. Donor No. 276's

320 semen deposits earned him over $11,000. Thus, donor No. 276's connection with Cryobank involved a substantial commercial transaction likely to affect the lives of many people.

We conclude that although donor No. 276 does indeed have a limited privacy interest in his identity as a sperm donor and in his medical history, under the circumstances of this case, it would be unreasonable for donor No. 276 to expect that his genetic and medical history, and possibly even his identity, would never be disclosed.

### 3. Conduct Constituting a Serious Invasion of Privacy

Petitioners seek to take John Doe's deposition in order to learn of all relevant facts he disclosed to Cryobank regarding his medical history of kidney disease. Petitioners also seek all of John Doe's records pertaining to "his family's affliction with [ADPKD], . . . secondary health problems diagnosed as being caused or related to ADPKD," and "the history of deponent's medical health as it relates to symptomology of ADPKD . . . ." As a result, what is at stake here is not only the disclosure of John Doe's identity and medical history, but of his family's as well. We conclude that such disclosure would involve an invasion of privacy unless reasonably curtailed.

### 4. Balancing of Interests

The constitutional right to privacy is not absolute and must therefore be balanced against other important interests. The *Hill* court described this tension as follows: " '[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution] . . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy.' [Citation.] [¶] The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law. [¶] Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing

interests." (*Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at pp. 37-38.)

Because discovery orders involve state-compelled disclosure, such disclosure is treated as a product of state action. (*Britt v. Superior Court* (1978) 20 Cal.3d 844, 856, fn. 3 [143 Cal.Rptr. 695, 574 P.2d 766]; *Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 566-567 [253 Cal.Rptr. 731].) Consequently, whenever the compelled disclosure treads upon the constitutional right of privacy, there must be a compelling state interest. (See also *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 842 [239 Cal.Rptr. 292, 740 P.2d 404] ["courts must balance the right of civil litigants to discover relevant facts against the privacy interests of persons subject to discovery"].)

We conclude that there are compelling state interests in this case. First, the state has a compelling interest in making certain that parties comply with properly served subpoenas and discovery orders in order to disclose relevant information to the fullest extent allowable. Second, the state has an interest in seeking the truth in court proceedings. As stated in *Palay v. Superior Court* (1993) 18 Cal.App.4th 919, 933 [22 Cal.Rptr.2d 839], "The state has enough of an interest in discovering the truth in legal proceedings, that it may compel disclosure of confidential material. [Citation.]" This includes medical records. (*Board of Medical Quality Assurance v. Gherardini, supra*, 93 Cal.App.3d at p. 679 ["an individual's medical records may be relevant and material in the furtherance of [a] legitimate state purpose . . ."].) Third, the state has a compelling interest in ensuring that those injured by the actionable conduct of others receive full redress of those injuries. Petitioners have demonstrated a compelling need to depose the *only* independent percipient witness that apparently can reveal the extent of information donor No. 276 disclosed to Cryobank. Such information is not only directly relevant to petitioners' claims, but is also relevant to Cryobank's affirmative defense of comparative fault. Thus, where, as here, the information sought "is essential to the fair resolution of the lawsuit, a trial court may properly compel such disclosure." (*Britt v. Superior Court, supra*, 20 Cal.3d at p. 859.)

We recognize that Cryobank has an interest in maintaining the confidentiality of those who agree to sell their sperm to its facility. But, as we have already stated, Cryobank cannot block disclosure of relevant donor information in every instance solely because it has a confidentiality agreement with purchasers of donated sperm and with the donors. Further, we question Cryobank's contention that without complete confidentiality its business will suffer because it will be unable to attract donors. Research on the subject suggests that confidentiality is generally more of a concern to

doctors than it is to donors. (*See* Swanson, *supra*, 27 Colum. J.L. & Soc. Probs. at pp. 171-172.) In addition, we do not hold in this case that complete and unfettered disclosure is justified, but only such disclosure as is necessary and relevant to the issues in the pending litigation.

While donor No. 276 has an interest in maintaining the confidentiality of his identity and medical history, we hold that in the context of the particular facts of this case the state's interests, as well as those of petitioners, *outweigh donor No. 276's interests.* Accordingly, John Doe must appear at his deposition and answer all questions and produce documents that are relevant to the issues raised in the litigation. But this does not mean that John Doe's identity must automatically be disclosed if he indeed is donor No. 276.

In *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 712 [21 Cal.Rptr.2d 200, 854 P.2d 1117] the court stated that in evaluating privacy claims for the protection of third parties, a court should consider its " ' "ability . . . to make an alternative order which may grant partial disclosure, disclosure in another form, or disclosure only in the event that the party seeking the information undertakes certain specified burdens which appear just under the circumstances." [Citation.] Where it is possible to do so, ". . . the courts should impose partial limitations rather than [an] outright denial of discovery." [Citation.]' "

For example, an order could be fashioned which would allow John Doe's deposition to proceed and documents produced on matters relevant to the issues in the litigation but in a manner which maintains the confidentiality of John Doe's identity and that of his family. Attendance at the deposition could be limited to the parties' counsel and the deposition transcript might refer simply to "John Doe" as the deponent. But we leave it to the trial court to craft the appropriate order.

*Motion for Judicial Notice*

John Doe has filed a motion asking us to take judicial notice of a document entitled PKD Patient's Manual: Understanding & Living with Autosomal Dominant Polycystic Kidney Disease, written by Irene Duley, R.N. A.N.P., and Patricia Gabow, M.D., in support of his arguments that petitioners' do not need to take his deposition in order to acquire information to provide better treatment for Brittany's disease. This document was never presented for the trial court's consideration in the parties' discovery dispute and John Doe offers no reason why it did not request the trial court to take judicial notice of this document. We therefore decline to take judicial notice

of this document and deny John Doe's motion. (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242]; *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 676, fn. 3 [76 Cal.Rptr.2d 691].)

*Conclusion*

We conclude that the trial court abused its discretion in denying petitioners' motion to compel John Doe's deposition and production of documents and in granting real parties' motion to quash. The trial court failed to consider the state and petitioners' countervailing interests that favor disclosure and failed to consider an order with " ' "partial limitations rather than [an] outright denial of discovery." ' " (*Schnabel v. Superior Court, supra,* 5 Cal.4th at p. 712.) Petitioners are entitled to take John Doe's deposition and inquire whether he is donor No. 276, and if he is, delve into his and his family's health and medical history, and his communications with Cryobank, but only as to those issues which are relevant to the pending litigation. Similarly, we conclude that petitioners are entitled to the production of documents identified in their renotice of John Doe's deposition which are relevant and in the possession, custody, or control of John Doe. But John Doe's identity is to be protected to the fullest extent possible and the identities of his family members are not to be disclosed.

DISPOSITION

The petition for writ of mandate is granted. The trial court is directed to vacate its order denying petitioners' motion to compel John Doe's attendance at his deposition and production of documents and granting real parties' motion to quash it. The trial court is further directed to grant petitioners' motion to compel and order John Doe's deposition and production of documents as outlined above and consistent with this opinion. Costs are awarded to petitioners.

Boren, P. J., and Nott, J., concurred.

The petitions of real parties in interest for review by the Supreme Court were denied August 23, 2000.