[No. G042205. Fourth Dist., Div. Three. Nov. 4, 2009.]

PERLAN THERAPEUTICS, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
NEXBIO, INC., et al., Real Parties in Interest.

---

---

## COUNSEL

Kirby Noonan Lance & Hoge, Michael L. Kirby, Jacob M. Slania and Julianne Hull for Petitioner.

No appearance for Respondent.

Fish & Richardson, Nancy L. Stagg and Olga I. May for Real Parties in Interest.

---

## OPINION

**IKOLA, J.**—Code of Civil Procedure section 2019.210[1] requires a plaintiff suing for misappropriation of its trade secrets to identify with "reasonable particularity" the purported trade secrets which allegedly have been misappropriated "before commencing discovery relating to the trade secret[s]." The court below concluded plaintiff Perlan Therapeutics, Inc.'s effort to meet this obligation fell short, and therefore granted defendants' motion for protective order precluding Perlan from pursuing discovery relating to its claimed trade secrets until it provided a sufficient identification. Perlan asks this court to issue a writ of mandate or prohibition to the trial court, directing it to accept Perlan's trade secret identification statement as sufficient and to allow Perlan to commence discovery.

We deny Perlan's petition. Two recent cases make clear that trial courts can require too much particularity in a trade secret statement and thereby abuse their discretion under section 2019.210. (See *Brescia v. Angelin* (2009) 172 Cal.App.4th 133 [90 Cal.Rptr.3d 842] (*Brescia*); *Advanced Modular*

---

[1] All statutory references are to the Code of Civil Procedure, unless otherwise specified.

*Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 833–834 [33 Cal.Rptr.3d 901] (*Advanced Modular*).) We publish this opinion to emphasize that trial courts still have broad discretion under section 2019.210. The court in this case applied the correct legal standard to Perlan's trade secret identification statement and there is a basis in the record to support the court's conclusion that the statement was not reasonably particular under the circumstances presented. We therefore will not provide the extraordinary relief requested by Perlan.

## FACTS

The allegations in this case follow a familiar pattern—alleged misappropriation of trade secrets by former employees. According to the second amended complaint, defendant Mang Yu incorporated Perlan in 1997 to develop "protein-based therapeutics for the treatment of diseases caused by viral infection and diagnostic products to detect viral infection." Yu and his wife, defendant Fang Fang, served as directors and officers of Perlan for varying periods of time. Perlan developed an "anti-viral protein-based therapeutic" known as "ColdSol™, a daily nasal spray for the prevention and treatment of the common cold."

Yu resigned from Perlan on or about June 1, 2001. Defendant NexBio, Inc., was incorporated on or about August 19, 2002. A statement filed by NexBio with the California Secretary of State in December 2002 indicated Yu was the chief executive officer of NexBio and both Yu and Fang served as directors of NexBio. Fang resigned from Perlan on or about May 16, 2003. Both Fang and Yu are currently directors and officers of NexBio. NexBio has succeeded in obtaining more than $50 million in grants to fund its research into protein therapies for influenza. Perlan claims NexBio was "secretly" formed by Yu and Fang "to wrongfully exploit and misappropriate the Perlan technology, inventions, and other proprietary information they converted and misappropriated from Perlan."

Perlan's second amended complaint includes 12 causes of action, but each claim for relief is at least in part based on the allegation that defendants misappropriated Perlan's trade secrets.[2] Defendants successfully moved for a protective order precluding discovery following Perlan's initial attempt to

---

[2] We are not presented with the question of whether Perlan's breach of fiduciary duty cause of action, conversion cause of action, contract causes of action, or any of the other causes of action stated in the second amended complaint include claims not dependent upon proof of Perlan's claim under the Uniform Trade Secrets Act, Civil Code section 3426 et seq. The court did not rule on this issue, indicating its order was "without prejudice to Plaintiff attempting to pursue [discovery unrelated to the alleged trade secrets]." The court advised the parties to meet and confer as to this issue and bring any disputes to the attention of the discovery referee in

provide a section 2019.210 trade secret disclosure statement. Perlan amended its statement, and this petition pertains to the sufficiency of Perlan's amended trade secret statement.

*Perlan's Amended Trade Secret Statement*[3]

Perlan begins its amended trade secret statement with a full page of text consisting of a "preliminary statement" and "general objections." This material, similar in appearance to the boilerplate reservations of right and objections often appearing in written discovery responses, makes no attempt to comply with section 2019.210.

The remainder of Perlan's amended trade secret statement consists of four pages of text. Much of the text simply repeats the narrative available in the publicly filed second amended complaint and provides additional technical detail that is nonetheless publicly available. For instance, the statement leads off with the following paragraph: "On or about December 2001, while [Fang] was an officer and director of Perlan, another senior scientist working at Perlan, Dr. Catherine Charles, developed a protein-based therapeutic that includes a heparin binding peptide to prevent and treat respiratory tract viral infections (hereinafter referred to as the 'Charles Invention'). Heparin binding peptide is a short segment of protein that preferentially attaches to heparin sulfate, a type of glycosaminoglycan that is ubiquitously present on cell membrane as well as on the surface of respiratory epithelium. The Charles Invention constituted part of Perlan's intellectual property and trade secret information. (The Charles Invention disclosure statement was previously produced by Perlan and [B]ates labeled as PER017920-017973)."[4]

The next three paragraphs provide details about the Charles Invention and related processes that were not included in the second amended complaint. The paragraphs refer to multimerization, peptides, glycosaminoglycan, and

---

the first instance. The only question before us is whether the court properly precluded Perlan from pursuing discovery related to its alleged trade secrets.

[3] We will exercise caution in our recitation of facts because the amended trade secret statement was designated confidential pursuant to a stipulated protective order and the relevant documents have been sealed at trial and on appeal. (Civ. Code, § 3426.5.)

[4] The Charles Invention disclosure statement includes a one-page description of the Charles Invention, plus an attached abstract from an August 1999 article entitled "Identification of a Linear Heparin Binding Domain for Human Respiratory Syncytial Virus Attachment Glycoprotein G." Charles annotated the abstract, suggesting Perlan could adapt the concepts advanced in the article using Perlan's own processes. The one-page typed description of the Charles Invention includes three paragraphs describing respiratory syncytial virus, with citations to published sources. The final paragraph includes specific technical proposals. This document appears to provide a "formula" or "recipe," at least in general terms, for the Charles Invention. Thus, we have considered the document in our review but have not included the specific language of the disclosure in our publicly available opinion.

reagents, and give general descriptions of how various processes would be used to attain the therapeutic goal of the invention (fighting viral infections). Despite the highly technical language used, it is apparent that this description does not provide specific identifications of the peptides or reagents used in the process. Further, the description references approximately 50 additional documents relating to the Charles Invention.

The next paragraph shifts to a different alleged technology involving the use of "sialidase" and certain proteins in a flu treatment; the gist of the narrative is that Fang conceived of this idea while still working at Perlan but hid her work from Perlan before leaving Perlan to join NexBio. There is additional technical detail provided, which is labeled a "novel idea" in the statement. The next paragraph proceeds to argue that Perlan (and not NexBio) conceived of the idea involving sialidase, and references 76 pages of dense prose, which purportedly establishes this fact. In the following paragraph, Perlan argues that its scientific consultant confirmed the novelty of this idea by reviewing published articles in the field. In short, Perlan seems to argue that because articles about the processes were published in 2005 and 2006, the idea must have been novel in 2003 when Fang left Perlan.[5] The statement then discusses the available evidence concerning the merits of Perlan's contentions, referencing an additional 125 pages of NexBio's grant and patent applications.

The statement concludes with the following paragraph: "As described [above], the Charles Invention, Perlan's Protein Multimerization Process, and Perlan's unique idea [concerning sialidase], and all related research, development, advancements, improvements and processes related thereto, constitute trade secrets owned by Perlan, now being developed in various forms by Defendants."

*Defendants' Motion for Protective Order*

Following receipt of Perlan's amended trade secret statement, defendants again moved for a protective order prohibiting Perlan from conducting

---

[5] We are somewhat unsure as to why Perlan (a bankrupt company without ongoing operations) insists on confidentiality with regard to its alleged trade secrets. In an abundance of caution, we will assume that our understanding of Perlan's argument (i.e., the trade secrets at issue have already been made public, but only after NexBio stole them) is an oversimplification and that there is still a good faith argument to be made that sealing court records is necessary to preserve the confidentiality of trade secrets that have not yet been revealed in published articles. Nonetheless, we urge Perlan to avoid imposing unnecessary costs on defendants and the courts by insisting on locking the barn door after the horse has escaped. This observation seems particularly apt in light of the fact that NexBio, the party allegedly taking advantage of Perlan's trade secrets to its ongoing financial advantage, represented at oral argument that it would have no problem with the court publishing Perlan's entire trade secret statement.

discovery until it complied with its obligation to identify its purported trade secrets with reasonable particularity. Defendants' motion argued Perlan had not remedied the shortcomings of its initial trade secret statement: "the Amended Statement remains a non-committal collection of loosely worded conclusory allegations, mainly referring to the Charles Invention." To wit, defendants criticized the references in the statement to proteins, peptides, sialidase, domains, and multimerization as lacking a clear explication how the particular substances and processes at issue were used in Perlan's particular alleged trade secret(s).

Defendants also pointed to the use of the word "included" in Perlan's description of the Charles Invention (i.e., the Charles Invention "*included* the concept of combining a multimerization peptide with a therapeutic peptide/domain"). Such language, according to defendants, suggests Perlan is only referring to general concepts involved in the Charles Invention but not providing a reasonably particular description of the Charles Invention itself. Moreover, defendants highlighted Perlan's continued reference to "*all related research, development, advancements, improvements and processes related thereto*" (italics added) as insufficient to meet the "reasonably particular" standard of section 2019.210.

Finally, defendants claimed the alleged trade secrets, such as they could be discerned, were not distinguished by Perlan from matters generally known in the scientific field in which Perlan and NexBio operate. Defendants claimed the "failure to specify the certain proteins or peptides at issue and to describe their combination leaves the Amended Statement too general to state a trade secret technology." Defendants submitted several scientific journal articles that were published prior to Fang's departure from Perlan, including one published in the May 2003 issue of Antimicrobial Agents and Chemotherapy that included Charles (as the lead author), Fang, and other Perlan employees as authors. The article, entitled "Prevention of Human Rhinovirus Infection by Multivalent Fab Molecules Directed against ICAM-1," discussed Perlan's development of a "technology for improving avidity by making bivalent, trivalent, or tetravalent recombinant polypeptides. We designed tripartite proteins consisting of the Fab fragment of an antibody fused with a hinge derived from human immunoglobulin D that was further linked to polymerization domains derived from human coiled-coil proteins." This article appears, in part at least, to publicly disclose the Charles Invention.

Perlan, of course, opposed defendants' motion. Perlan claimed its amended statement "identifies at least eight (8) trade secrets[] that, in combination with one another, form the trade secrets misappropriated by Defendants. The Amended Statement describes how the combination of the trade secrets distinguish them from matters within the general knowledge of persons

within the field." Perlan also decried the lack of evidentiary submissions by defendants (other than their attorney's declaration) to support the contention that Perlan's statement was vague and unintelligible.

Perlan submitted expert declarations from Dr. Joseph Chuang and Dr. Catherine Charles (inventor of the Charles Invention) to assist in its argument that the statement provided reasonably particular descriptions of trade secrets. The Chuang declaration first summarized the trade secret statement. Chuang then opined the statement "identifies the following eight trade secrets: (1) the Charles Invention, (2) Perlan's Protein Multimerization Process, (3) Perlan's novel idea [regarding sialidase and the flu], and (4) all related research, (5) development, (6) advancements, (7) improvements and (8) processes related thereto." Chuang claims the idea regarding sialidase was "novel," reasoning that scientific articles were published in 2005 and 2006 discussing this approach, and articles "are only accepted for publication if the idea, methods, and results are novel . . . ." These articles, in part at least, appear to establish public access (as of 2005 and 2006) to Perlan's allegedly novel idea involving the use of sialidase to create a drug to combat the flu.

Charles opined, "Perlan's trade secrets are identified with reasonable particularity in Perlan's Amended Trade Secret Statement . . . ." Charles attested her review of "documents retrieved from Fang's computer [indicated] Perlan conceived the novel idea [regarding] sialidase . . . to fight influenza and the flu virus." Charles also attested she, while working at Perlan, "conceived the novel idea of developing a protein based therapeutic that included a heparin binding peptide to prevent and treat respiratory tract viral infections."

*The Court's Ruling*

The court granted defendants' motion for protective order, concluding Perlan "failed to demonstrate that the purported trade secret(s) is not generally known to the public or to other persons who can obtain economic value from its disclosure or use. [Citation.] The Court also finds the Amended Trade Secret Statement continues to be vague because Plaintiff appears to be pursuing a claim for misappropriation of several trade secrets but the Statement has not clearly identified all of the trade secrets at issue." At oral argument, the court labeled "some of the comments made in the declarations by [Perlan's expert witnesses as] conclusory."

The court asked at oral argument whether "the recipe for [the Charles Invention] trade secret has been adequately addressed." Counsel for Perlan responded, "We don't have to give the chemical equation for how everything works. We don't have to spell [out] specific details." Counsel for Perlan later argued, "And if you want the scientific equation . . . , I think that's more than

what is required under a reasonably particular standard. We don't have to provide absolute precision." Counsel for Perlan expressed concern that, if Perlan were required to provide "absolute precision" at the outset of the case, "when it comes time for trial, when more discovery is conducted and more scientists testify about the process and you hear experts . . . , we're going to be faced with an argument from [defendants] that, oh, no, no, no, no, no, you're coloring outside the lines. The process that I made you identify in your second or third amended trade secret statement was down to the letter . . . . And what your expert just testified to was a slightly different scientific equation, and, therefore, sorry, no trade secret. It's something different. [¶] Well, that's not fair to the plaintiff in this case. [Defendants] know what they took. . . . They're clearly on notice of what it is that we're claiming is a trade secret; maybe [defendant's counsel] isn't, but her clients, the defendants, the scientists are."

Perlan's counsel indicated, as to trade secrets not specifically described in the statement, Perlan has not been able to determine what Yu and Fang worked on at Perlan and needs to engage in discovery to obtain additional information. Counsel for Perlan again pointed out no expert evidence had been provided by defendants to show that the trade secret identifications were insufficient, suggesting defendants had not met an evidentiary burden of showing the identification was insufficient.

## DISCUSSION

"Writ proceedings are not the favored method for reviewing discovery orders because typically the delay caused by such review results in greater harm than in the enforcement of an improper discovery order. [Citations.] The aggrieved party must usually wait to raise the ruling by direct appeal from the final judgment. [Citation.] [¶] As a result, writ review of discovery rulings are limited to situations where (1) the issues presented are of first impression and of general importance to the trial courts and to the profession [citation], (2) the order . . . prevents a party from having a fair opportunity to litigate his or her case [citations], or (3) the ruling compelling discovery would violate a privilege [citations]." (*Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1060–1061 [95 Cal.Rptr.2d 864].)

*Trade Secret Discovery*

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its

disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d)(1), (2).)

"In any action alleging the misappropriation of a trade secret . . . , before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ." (§ 2019.210.)[6] The parties disagree as to whether the trial court correctly concluded Perlan's trade secret statement, detailed above, did not meet the standard of "reasonable particularity" set forth in the statute.

■ "The purpose of section 2019.210 is as follows: 'First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets. [Citations.] Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope. [Citations.] Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.' " (*Advanced Modular, supra*, 132 Cal.App.4th at pp. 833–834.)

It appears the second listed purpose is not especially relevant in this case, as Perlan declared bankruptcy and no longer employs any scientists. It is unreasonable to think Perlan hopes to reenergize its own business with knowledge obtained from NexBio in discovery. Perlan, essentially a corporate shell, exists only in order to pursue this lawsuit. Perlan's counsel conceded Perlan's initial attempt at section 2019.210 compliance was "bare bones, because [counsel] prepared it [without assistance from any scientists]." It is understandable that Perlan might have more difficulty than the typical trade secret plaintiff in stating its trade secret claims with reasonable particularity. But Perlan is not entitled to more lenient application of section 2019.210, as each of the other three purposes of section 2019.210 retains potency in this case: dissuading meritless claims, allowing the trial court to frame discovery, and permitting defendants sufficient time to form and develop defenses.[7]

---

[6] The prediscovery trade secret identification statute, enacted in 1984, was "intended to codify *Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 251–25[3] [67 Cal.Rptr. 19] (*Diodes*), that before a trade secret defendant must submit to potentially costly litigation and discovery, 'the complainant should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.' " (*Brescia, supra*, 172 Cal.App.4th at p. 144.)

[7] Perlan suggested at oral argument that, even in the absence of an adequate trade secret statement, it should be allowed to conduct limited depositions of Fang and Yu relating solely to

A recently published article explores the "ubiquitous" problem of litigating the appropriate scope and timing of trade secret identification. (See Graves & Range, *Identification of Trade Secret Claims in Litigation: Solutions for a Ubiquitous Dispute* (2006) 5 Nw. J. Tech. & Intell. Prop. 68 (Graves & Range).) As the authors explain, "Trade secret plaintiffs rarely provide a precise and complete identification of the alleged trade secrets at issue without a court order requiring them to do so. This is a strategy, not an accident. The tactical advantages a plaintiff gains from non-identification are too tempting for a plaintiff to voluntarily provide such identification. In a typical case, the plaintiff . . . provide[s] little more than a list of high-level, generic categories in which its alleged secrets are said to reside. [¶] It is also common for a trade secret plaintiff to alter its list of trade secret claims as the case proceeds—sometimes dramatically, by replacing entire categories of information or technology, or by re-combining slippery, multi-element 'combination trade secret' claims into new subsets." (*Id.* at p. 68.)

Perlan's counsel admitted to such strategic concerns at oral argument in the trial court, explaining that defendants hoped to box in Perlan's claims before discovery begins. On one hand, Perlan is reluctant to provide particularity to the degree of identifying chemical equations for fear the initial disclosure will be inaccurate in some manner or too narrow to cover the actual processes utilized by NexBio, thereby aiding defendants during discovery and at trial. On the other hand, Perlan cites an inability to disclose with particularity trade secrets of which it is not yet aware or lacks full information. In other words, Perlan wants to conduct discovery so it can ask defendants about NexBio's business, and what Fang and Yu worked on during the time period they were still associated with Perlan, with an eye toward enhancing Perlan's understanding of the trade secrets already asserted and adding additional particular trade secret claims as discovery potentially uncovers further instances of stolen trade secrets.[8]

---

their work at Perlan. Perlan suggests it is in the unique position of trying to determine what its former employees worked on without having access to its former employees. But this is not a unique scenario in trade secret claims, and section 2019.210 nevertheless precludes commencement of discovery pertaining to the trade secrets prior to their identification with reasonable particularity.

[8] There is another commonly cited reason for plaintiffs' general reluctance to disclose trade secrets with precision. "A plaintiff will often seek to avoid disclosing his trade secrets in litigation even though he alleges that the defendant knows and has misappropriated them. Although on the surface seemingly illogical, in fact often that is an understandable position. The plaintiff fears that full disclosure in an orderly fashion in discovery will only further 'educate' the defendant who plaintiff fears, is improperly (but hopefully imperfectly) using the plaintiff's trade secrets. If indeed the misappropriation has been less than perfect, full disclosure by the plaintiff is apt to be of considerable interest to the defendant. If plaintiff does not prevail, defendant has been awarded a scholarship to plaintiff's trade secret matter. [¶] Plaintiffs in such cases also wish to avoid the public or potentially public disclosure that litigation risks. Indeed, if a court finds against the plaintiff the alleged trade secret may even be

The record described above supports two conclusions: (1) Perlan has the ability (but not the inclination) to provide clearer, more specific information about at least one of its alleged trade secrets;[9] and (2) although Perlan lacks any particular information beyond three purported trade secrets, Perlan wishes to reserve the right to unilaterally amend (without leave of the court) its identification so it can broaden its lawsuit to include claims it hopes to develop in discovery.[10] Two cases guide our inquiry into whether the trial court has discretion under section 2019.210 to compel Perlan to provide more information about what it knows (or could figure out with additional work) and to refrain from including vague references to additional related research, development, advancements, improvements, and related processes. (See *Brescia, supra*, 172 Cal.App.4th 133; *Advanced Modular, supra*, 132 Cal.App.4th 826.)

*Advanced Modular*

In *Advanced Modular*, plaintiff Sputtered Films, Inc., sued its former employees and the firm those employees established, Advanced Modular Sputtering, Inc. (AMS). (*Advanced Modular, supra*, 132 Cal.App.4th at pp. 830–831.) Sputtered Films alleged AMS became its primary competitor in the field of "sputtering" equipment—machines that deposit "a thin and even film of material onto a silicon wafer or other substrate"—by misappropriating Sputtered Films's trade secrets. (*Id.* at p. 830.) The trial court rejected three separate attempts by Sputtered Films to identify its trade secrets pursuant to section 2019.210, finding each attempt lacked meaningful particularity. (*Advanced Modular*, at pp. 831–832.) Sputtered Films filed a writ petition challenging the trial court's rejection of its third trade secret identification statement. (*Id.* at p. 832.)

Although the *Advanced Modular* opinion provided a "purposefully vague" description of the claimed trade secrets to "avoid disclosure of the parties'

described in the opinion." (3 Milgrim on Trade Secrets (2009) § 14.02[2].) This concern was not raised by Perlan in the court below, but is mentioned in Perlan's petition. In light of Perlan's lack of ongoing operations, this purported justification for holding back information is disingenuous.

[9] Perlan has already retained two experts, including the inventor of the Charles Invention. Assuming there actually were some equations, formulas, processes, or combinations of any of the categories that were trade secrets of Perlan, the experts and attorneys together could create a document which would more clearly identify those trade secrets than the amended trade secret statement that is the subject of this petition.

[10] As noted, Perlan's eight purported trade secrets are: "(1) the Charles Invention, (2) Perlan's Protein Multimerization Process, (3) Perlan's novel idea [involving sialidase to] create a drug to combat the flu, and (4) all related research, (5) development, (6) advancements, (7) improvements and (8) processes related thereto." Obviously, the final five categories lack any reasonable particularity, and thus relate to Perlan's concern that it be entitled to conduct broad discovery and expand upon its particular trade secret claims based upon information it uncovers in discovery.

confidential information," several features of the disclosure can be gleaned. (*Advanced Modular, supra,* 132 Cal.App.4th at p. 831, fn. 2.) First, there were eight alleged trade secrets advanced by Sputtered Films. (*Id.* at p. 832.) Second, for six of the eight trade secrets, Sputtered Films relied on a claim that "the combination of . . . features" it had identified was "unique and secret." (*Ibid.*) Third, Sputtered Films did not produce a complete copy of its source code, which comprised one of its alleged trade secrets. (*Ibid.*) The discovery referee who considered the issue in the first instance "complained that the individual features of the trade secrets were not 'identified with adequate particularity to apply them meaningfully.' " (*Ibid.*)

■ While acknowledging the discretionary nature of discovery rulings, the appellate court determined the question before it was one of law, i.e., a de novo determination of the meaning of section 2019.210. (*Advanced Modular, supra,* 132 Cal.App.4th at p. 833.) The *Advanced Modular* court observed, "[t]he letter and spirit of section 2019.210 require the plaintiff . . . to identify or designate the trade secrets at issue with ' "sufficient particularity" ' to limit the permissible scope of discovery by distinguishing the trade secrets ' "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." ' " (*Id.* at p. 835.) "The trade secret designation mandated by section 2019.210 is not itself a pleading but it functions like one in a trade secret case because it limits the scope of discovery . . . . Generally speaking, pleadings are to be liberally construed in favor of the pleader and doubts about the permissible scope of discovery are to be resolved in favor of disclosure." (*Ibid.,* citations omitted.)

Trade secret identification does not require "every minute detail" of the trade secret (*Advanced Modular, supra,* 132 Cal.App.4th at p. 835) or the "greatest degree of particularity possible" (*id.* at p. 836). Nor does section 2019.210 envision a "miniature trial on the merits of a misappropriation claim before discovery may commence." (*Advanced Modular,* at pp. 835–836.) However, where "the alleged trade secrets consist of incremental variations on, or advances in the state of the art in a highly specialized technical field, a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." (*Id.* at p. 836.)

■ Applying its interpretation of the statute to the order before it, the *Advanced Modular* court concluded: "Here, Sputtered Films has identified eight alleged trade secrets, each with several [discrete] features that, in combination with one another, form the alleged trade secrets. It has described how it believes the combination of these features distinguish the alleged trade secrets from the prior art, or matters within the general knowledge of persons in the sputtering industry. AMS and its experts contend the alleged trade

secrets are well known in the industry and that they have been described in a vague or overbroad manner. Sputtered Films's experts dispute both contentions. We have no doubt the experts will continue to disagree on these crucial questions. For our purposes, at this prediscovery stage of the proceedings, it is appropriate to recognize the existence of this credible dispute, but not necessarily to resolve it. Where, as here, credible experts declare that they are capable of understanding the designation and of distinguishing the alleged trade secrets from information already known to persons in the field, the designation should, as a general rule, be considered adequate to permit discovery to commence." (*Advanced Modular, supra,* 132 Cal.App.4th at p. 836.)

*Brescia*

Brescia claimed several parties misappropriated his trade secrets, namely, " 'a formula, manufacturing process, marketing plan, funding plan and a distribution and sales plan for a high protein, low carbohydrate pudding with an extended shelf life and a stable and appealing consistency and . . . an appetizing flavor.' " (*Brescia, supra,* 172 Cal.App.4th at pp. 138–139.) Ruling on successive motions for protective orders, the trial court rejected as insufficient each of Brescia's attempts to comply with section 2019.210. (*Brescia,* at pp. 139–142.)

Brescia's operative trade secret statement "identified two alleged trade secrets: his pudding formula and his manufacturing process." (*Brescia, supra,* 172 Cal.App.4th at p. 140.) Brescia provided a single-page document "containing a list of the 15 specific ingredients that constituted Brescia's pudding formula," which identified "each ingredient by its common name and the percentage it constitutes of the total pudding." (*Id.* at p. 141.) Brescia also "listed each step in the mixing, testing, and code marking of the pudding." (*Ibid.*) The trial court found the precise disclosure of formula and process trade secrets to be insufficient because the "submission was silent on the question whether his alleged trade secrets were known to skilled persons in the field." (*Id.* at p. 142.) The trial court's ruling apparently relied on the pronouncement in *Advanced Modular* that "[t]he letter and spirit of section 2019.210 require the plaintiff . . . to identify or designate the trade secrets at issue with ' "sufficient particularity" ' to limit the permissible scope of discovery by distinguishing the trade secrets ' "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." ' " (*Advanced Modular, supra,* 132 Cal.App.4th at p. 835.) Brescia appealed the court's order rejecting his third attempt at compliance.

■ After discussing the language and history of the statute, as well as the facts and holding of *Advanced Modular, supra,* 132 Cal.App.4th 826, the

appellate court turned to Brescia's operative trade secret statement, applying de novo review due to undisputed facts and the "unusual procedural posture of [the] case." (*Brescia, supra*, 172 Cal.App.4th at p. 143.) The *Brescia* court explained section 2019.210 "does not create a procedural device to litigate the ultimate merits of the case—that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists." (*Brescia*, at p. 149.) Thus, the court concluded, "Brescia's showing was certainly adequate to permit respondents to investigate whether his alleged trade secrets were within the public domain and prepare a defense." (*Id.* at p. 151.) The court rejected the theory that a trade secret claimant must, in every case, explain how the alleged trade secret differs from information available in the public domain: "[T]he court [in *Advanced Modular*] was not creating a requirement for all cases, divorced from the particularity requirement itself, of explaining how the trade secret differs from prior art." (*Id.* at p. 147.)

In dicta, the *Brescia* court approved the trial court's findings that Brescia's first two attempts to identify his trade secrets were insufficient. (*Brescia, supra*, 172 Cal.App.4th at p. 150 ["We agree that the trial court correctly found Brescia's pre-August 2007 attempts to identify his alleged trade secrets inadequate."].) Brescia's first attempt to comply was simply referring to his cross-complaint and the documents he produced in discovery. (*Id.* at pp. 139–140.) His second attempt consisted of providing a list of four categories (marketing strategies, budget and finance, formula, and manufacturing process) and referring by category to 305 attached documents. (*Id.* at p. 140.) The trial court instructed Brescia "to 'succinctly and with particularity lay out the trade secrets without surplusage,' instead of 'essentially hiding the alleged trade secret in plain view by putting lots of clutter around it.' " (*Ibid.*)

*Standard of Review*

We think a clarification of the standard of review is necessary before proceeding further in our analysis. *Advanced Modular* and *Brescia* both rightly noted that appellate courts should interpret the meaning of section 2019.210's "reasonable particularity" requirement de novo. But those cases may have given litigants the mistaken impression that every appeal or writ petition concerning a trial court's section 2019.210 determination should be reviewed de novo. This is simply wrong: discovery rulings are reviewed for an abuse of discretion. (*Scripps Health v. Superior Court* (2003) 109 Cal.App.4th 529, 533 [135 Cal.Rptr.2d 126].) In *Advanced Modular* and *Brescia*, the trial courts abused their discretion by applying improper understandings of the legal meaning of "reasonably particular." In *Advanced Modular*, the trial court improperly weighed competing expert declarations, turning the discovery dispute into a trial on the merits. In *Brescia*, the trial

court demanded an explanation of how the trade secret differed from publicly available knowledge, even though the alleged trade secret was identified with precision.

So long as a trial court applies the correct legal standard and there is a basis in the record for its decision, appellate courts should not micromanage discovery. Rather, the trial court must exercise its sound discretion in determining how much disclosure is necessary to comply with section 2019.210 under the circumstances of the case. (*Advanced Modular, supra*, 132 Cal.App.4th at p. 836.) Trial courts, charged with managing and seeing cases through the discovery process to trial, are best suited to determining whether a trade secret statement is "reasonably particular" under the circumstances of the case. Trial courts are also best situated to judge whether the parties are acting in good faith with regard to their discovery positions or, alternately, engaging in abusive litigation tactics.

Neither *Brescia* nor *Advanced Modular* provides an easy answer to the question presented here. Perlan admittedly did not provide the equivalent of Brescia's succinct and transparent identifications of his formula and manufacturing process. Thus, the trial court here did not commit legal error under *Brescia* in holding insufficient Perlan's efforts to particularize its trade secrets and distinguish them from publicly available information. Indeed, Perlan's trade secret statement is not "succinct," it contains pages of "surplusage" (objections, qualifications, explanations, allegations), and it references hundreds of pages of documents. These features of Perlan's trade secret statement link it with Brescia's early attempts at identification, which were deemed inadequate (in dicta) in *Brescia*. (*Brescia, supra*, 172 Cal.App.4th at p. 150.)

 The lack of detail concerning the composition of the trade secret statement in the *Advanced Modular* opinion limits our ability to determine the extent to which its holding favors Perlan in the case before us. *Advanced Modular* holds plaintiffs are not required by the terms of section 2019.210 to describe trade secrets "with the greatest degree of particularity possible, or to reach such an exacting level of specificity that even [their] opponents are forced to agree the designation is adequate." (*Advanced Modular, supra*, 132 Cal.App.4th at p. 836.) In other words, the precision provided by Brescia in his operative trade secret statement is not required in every case. But this rule does not make clear how much particularity is enough in any specific case. (See Graves & Range, *supra*, 5 Nw. J. Tech. & Intell. Prop. at p. 85 ["It remains somewhat unclear [after *Advanced Modular*] what 'reasonable particularity' means in any given case. Does it mean that a plaintiff must provide 51 percent of the details that would be necessary for a completely precise identification of each claim, 67 percent, 75 percent, or more?"].) Moreover,

there is no indication whether the trade secret statement approved in the *Advanced Modular* case included "surplusage" and references to hundreds of pages of documents.

*Advanced Modular* acknowledges that in "a highly specialized technical field" (like the one at issue here) "a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." (*Advanced Modular, supra,* 132 Cal.App.4th at p. 836.) In making this showing, the *Advanced Modular* plaintiff *"described how"* it believes the combination of [its trade secret] features distinguish the alleged trade secrets from the prior art, or matters within the general knowledge of persons in the . . . industry." (*Ibid.,* italics added.)

*Perlan's Trade Secret Statement*

■ Turning to the court's order, we conclude the court was justified in finding "the Amended Trade Secret Statement continues to be vague because Plaintiff appears to be pursuing a claim for misappropriation of several trade secrets but the Statement has not clearly identified all of the trade secrets at issue." Perlan is not entitled to include broad, "catch-all" language as a tactic to preserve an unrestricted, unilateral right to subsequently amend its trade secret statement. If Perlan does not know what its own trade secrets are, it has no basis for suggesting defendants misappropriated them. Nor is Perlan entitled to hide its trade secrets in "plain sight" by including surplusage and voluminous attachments in its trade secret statement.[11]

If, through discovery, Perlan uncovers information suggesting defendants misappropriated additional trade secrets, it may have good cause to amend its trade secret statement under appropriate circumstances.[12] (See *Neothermia Corp. v. Rubicor Medical, Inc.* (N.D.Cal. 2004) 345 F.Supp.2d 1042, 1045 [applying prior version of § 2019.210 and indicating plaintiffs would be required to show good cause to amend trade secret statement]; Graves & Range, *supra,* 5 Nw. J. Tech. & Intell. Prop. at p. 99 ["One can envision

---

[11] This is not to say that a court would abuse its discretion if it allowed a section 2019.210 statement to include such surplusage and voluminous attachments.

[12] Of course, Perlan is concerned that a narrow identification of its purported trade secrets will place constraints on discovery which could theoretically prevent it from ever finding out about trade secrets that were stolen. This is conceivable. But it is important to remember that parties may conduct discovery "regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (§ 2017.010.) Thankfully, it is not our role to predict how this broad standard will be applied to the innumerable skirmishes that will occur between the parties once Perlan is able to begin the discovery process in earnest.

circumstances where amendment [of the trade secret statement] would be proper, such as where a plaintiff learns that a defendant has misappropriated trade secrets beyond those first believed to be at issue."]; but see *Pixion, Inc. v. Placeware Inc.* (N.D.Cal. 2005) 421 F.Supp.2d 1233, 1242 [refusing to allow plaintiff to amend § 2019.210 disclosure to defeat motion for summary judgment].)

The other half of the court's order is slightly ambiguous. The court found Perlan did not adequately "demonstrate that the purported trade secret(s) is not generally known to the public or to other persons who can obtain economic value from its disclosure or use."

If the court meant Perlan was required to convince the court (as a fact finder) that the purported trade secrets are actually secret, it would constitute legal error. Perlan is *not* required to convince defendants or the court in its section 2019.210 statement that its alleged trade secrets are not generally known to the public. This is an element of their case that must be proven, but not at the prediscovery stage of the action. The holding of *Advanced Modular* is that if a plaintiff makes a sufficient showing under section 2019.210 (through an expert or otherwise), the fact that defendant (or an expert) submits contrary evidence is inconsequential. This is true even if there is undeniable evidence that the plaintiffs' purported trade secret is actually public knowledge. "The statute . . . does not create a procedural device to litigate the ultimate merits of the case—that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists." (*Brescia, supra*, 172 Cal.App.4th at p. 149.)

It appears, however, the court was simply applying the rule that in "a highly specialized technical field" (such as developing protein-based treatments for viral infections) "a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." (*Advanced Modular, supra*, 132 Cal.App.4th at p. 836.) The court did not erroneously conduct a hearing on the merits of whether Perlan actually had any trade secrets. Instead, the court found the trade secret statement and the expert declarations submitted by Perlan to be conclusory on the question of what precisely was not known to the public. Perlan did not explain "how" its alleged trade secrets were novel. (*Advanced Modular, supra*, 132 Cal.App.4th at p. 836.) "The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135–1136 [234 Cal.Rptr. 630].) It is not creditable expert testimony to simply list the purported trade secrets and label them "reasonably particular" and "novel." Nor was the court required to credit Perlan's

sophistic argument that one of its trade secrets must have been novel in 2003 because someone successfully published an article on the process in 2005.[13]

The evidentiary quality of defendants' submissions is largely irrelevant to the question of whether the trial court had discretion to reject Perlan's statement as insufficient. If Perlan made its showing with reasonable particularity, defendants cannot defeat such disclosure by submitting better evidence.

 In short, the court did not commit legal error. Perlan did not identify its trade secrets with absolute precision (the "recipe" or the "equations"). Nor did Perlan describe with a "more exacting level of particularity" how its secrets differed from publicly available knowledge. Thus, the court was not *required* to accept Perlan's submissions as sufficient as a matter of law.

There is a strong basis in the record for the court's decision to grant defendants' motion for protective order. Perlan's trade secret statement lacks clarity. Perlan did not segregate its alleged trade secrets (by, for example, listing them numerically in the statement). Perlan did not clearly explain how its secrets (or secret combinations of publicly available processes) differed from publicly available knowledge. Perlan included a large amount of "surplusage" in its statement, such as legal objections, factual allegations, and reservations of right. Perlan referenced hundreds of pages of extra documents.

 Trial courts may, in their discretion, require more of trade secret plaintiffs than what was provided by Perlan. A court does not abuse its discretion by compelling a plaintiff to produce a clear, nonevasive trade secret statement.[14]

---

[13] Perlan and Chuang assert that because scientific journals only accept articles for publication that are novel, the process described in the 2005 article must have been novel prior to its publication. This does not explain *how* the process that Perlan claims is a trade secret is different from publicly available knowledge in the trade.

[14] The following order, quoted in part from a federal district court case, is one approach taken by a trial judge to some of the problems presented by extended litigation over the initial trade secret identification mandated by section 2019.210: "The Amended Identification of Trade Secrets shall be narrowed to include only items that Plaintiff considers are its actual trade secrets, and only those trade secrets that Plaintiff has reasonable grounds to allege were misappropriated by Defendant." (*Myrio Corp. v. Minerva Network Inc.* (N.D.Cal., Apr. 10, 2001, No. C00-20996 RMW) 2001 U.S.Dist. Lexis 10461, pp. *1–*2.) "[I]f Plaintiff later discovers information that would support an allegation that additional trade secrets were misappropriated, it may be appropriate for the court to grant leave to further amend the identification of trade secrets." (*Id.* at p. *2, fn. 2.) "If Plaintiff contends that a trade secret consists of a specific combination of items, it shall so state and concisely describe the combination. If Plaintiff contends that its specific use of an otherwise publicly known item constitutes its secret, it shall so state and concisely describe the use. All trade secrets shall be described in narrative form, rather than by cross-reference to other trade secrets or documents.

*Extraordinary Relief Is Unwarranted*

As the court did not abuse its discretion, writ relief is, of course, not merited in this case. We also question whether writ relief is ever warranted in circumstances like those presented here, i.e., there is an adequate protective order in place; the plaintiff could provide more particular information in its trade secret statement but chooses not to do so because it is only required under the statute to provide a "reasonably particular" description of the trade secret; and the trial court has given the plaintiff a reasonable opportunity to amend its trade secret statement.

Perlan argues it would suffer undue prejudice if it were forced to disclose additional information about its trade secret claims at the outset of the case. But the only prejudice to Perlan, even assuming for the sake of argument that the court required too much disclosure under section 2019.210, is that Perlan would be required to disclose information it could be compelled to disclose later under other discovery procedures.

Presumably, the defendants in a trade secret case will propound interrogatories requesting the plaintiffs to identify the trade secrets at issue in the lawsuit and the alleged novelty of those trade secrets. Trial courts have the power to require parties, upon pain of sanctions (§ 2023.030), to provide clear responses to written interrogatories (§ 2030.220, subd. (a) ["Each answer in a response to interrogatories shall be as complete and straightforward as the information reasonably available to the responding party permits."]). Once discovery begins, Perlan cannot withhold discoverable information in its possession. Moreover, trial courts also have the power to fashion protective orders delaying discovery by a party. (§§ 2025.420, 2030.090, 2031.060, 2033.080.) In essence, the Civil Discovery Act (§ 2016.010 et seq.) authorizes courts to order a party to produce discoverable information before other discovery proceeds if the court finds good cause to do so.

Defendants gain strategic and tactical advantages when they are able to convince trial courts that plaintiffs should be required to provide more details pursuant to section 2019.210 before plaintiffs are able to commence discovery. These advantages could be significant, not only because plaintiffs must "go first," which allows defendants to tailor their defense to plaintiffs' disclosure, but also because there is often significant delay and cost in compelling satisfactory interrogatory responses. But the court's conferral of a tactical advantage in discovery, which often occurs when courts are asked by the parties to intervene in discovery disputes (e.g., who must submit first to depositions or how much detail must be provided in written discovery

---

If Plaintiff references a document as setting forth one or more trade secrets, it shall specify precisely which portions of the document describes [*sic*] the trade secret(s)." (*Id.* at pp. *2–*3.)

responses), does not usually justify appellate court intervention upon a petition for writ of mandate.

## DISPOSITION

We deny Perlan's petition for writ of mandate or prohibition. Defendants shall recover their costs arising out of this petition.

Bedsworth, Acting P. J., and O'Leary, J., concurred.

Petitioner's petition for review by the Supreme Court was denied February 18, 2010, S178760.